**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John Lee MOLINARO, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Donald P. MANGANO, Sr.,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Donald P. MANGANO, Sr.,
Defendant–Appellant.**

**Nos. 90–50131, 90–50133 and 90–50375.**

United States Court of Appeals,
Ninth Circuit.

Submitted on the Briefs Dec. 7,
1992 * in No. 90–50131.

Argued and Submitted Dec. 7, 1992
in Nos. 90–50133 and 90–50375.

Submission Vacated Dec. 16, 1992.

Resubmitted April 26, 1993.

Decided Nov. 17, 1993.

---

* The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34–4.

John Lee Molinaro, pro se.

William J. Genego, Santa Monica, CA, for defendant-appellant Mangano.

Steven E. Zipperstein, U.S. Dept. of Justice, Washington, DC, for plaintiff-appellee.

Before: BROWNING, SCHROEDER and FLETCHER, Circuit Judges.

JAMES R. BROWNING, Circuit Judge:

John Molinaro and Donald Mangano appeal their convictions of bank fraud in violation of 18 U.S.C. § 1344 and conspiracy to defraud the United States in violation of 18 U.S.C. § 371. Molinaro also appeals his conviction of making false entries in the books and records of a savings and loan association in violation of 18 U.S.C. § 1006.[1]

## I. *Factual Background*

The charges arose out of several transactions involving the Ramona Savings and Loan, a federally insured savings and loan owned by appellant Molinaro.

The government's principal claim is that appellants concealed Mangano's role as the purchaser of 173 units in Cherokee Village, a failing 180 unit condominium project, sold to Mangano by Ramona. The government claimed appellants concealed the fact that

---

1. Mangano was not charged with this crime.

Mangano was the purchaser to avoid scrutiny of the transaction by the Federal Home Loan Bank Board, which was on the verge of taking over Ramona because of its precarious financial position resulting from Ramona's inability to sell the condominiums in which it had invested over $25,000,000. The federal regulators had expressed concern over Ramona's heavy concentration of assets in real estate development projects. The sale of the condominiums at a stated price of $29 million allowed Ramona to show a paper profit of $4,000,000 and temporarily appease the Board.[2]

Mangano had been a fifty percent owner of Ramona until shortly before the sale.[3] The parties were understandably concerned that the Board would closely scrutinize the transaction and its impact on Ramona's financial condition if the Board were aware of the purchaser's identity.

To conceal Mangano's participation, the Cherokee Village units were sold to three Subchapter S corporations formed by three individuals, Dariano, DeCarlo and Calvello, to act as straw buyers. Mangano then purchased the corporations from the three individuals. All documents submitted to the bank were signed by Dariano, DeCarlo and Calvello as officers and directors of the three corporations. Initially, 136 of the Cherokee Village units were transferred to Mangano in this fashion. The remaining units were transferred to the corporations three months later. Although Mangano then owned all the stock of the "S" corporations, none of the documents submitted to the bank at the time of the second sale reflected that fact. De-Carlo, Dariano and Calvello had remained officers of the corporations, and Patricia Mangano, Mangano's daughter-in-law and a Ramona employee, signed their names to the documents.

In addition to concealing Mangano's role in the sale of the Cherokee Village units, the government alleged that appellants fraudulently caused Ramona to pay $287,000 in street improvement bond assessments due on five parcels of Palm Springs land. Mangano had transferred this land to the three "S" corporations to serve as collateral for the loans made to finance the first sale of condominiums and as a means to pay off the straw purchasers. Like the records submitted to the bank in connection with the sale, no documents relating to the payment of the bond assessments revealed Mangano's interest in the property.

The other bank fraud charges involve steps taken to facilitate regulatory approval of the sale of Molinaro's entire interest in Ramona to Donald Stump by concealing the fact that Stump owed Ramona $10 million, representing 100% financing by Ramona of the purchase of Rancho Cielo by Stump less than six months before he and Molinaro opened negotiations for Stump's purchase of Ramona. Around the time of the negotiations, Stump quitclaimed Rancho Cielo to Robert Rumney, Inc., a corporation owned by Mangano's friend, Robert Rumney. The government alleged that to pay Rumney for his participation, appellants fraudulently induced Ramona to extend the term of a prior $40,000 loan to Rumney for an additional three years and to pay Rumney $2,000 for "consulting services" he had not performed.

The remaining charges involve false entries in Ramona's books and records in connection with Mangano's sale of all 173 Cherokee Village units back to Ramona. The indictment alleged the false entries were intended to make the transactions appear profitable and forestall the possible takeover of Ramona by the Board.

The Board began an audit of Ramona in June 1986. The federal regulators took over the bank the following September, after discovering that the various transactions involving Cherokee Village had caused Ramona's net worth to drop below zero. Appellants were charged in a thirty-three count indictment with bank fraud, conspiracy to defraud

---

**2.** Ramona agreed to finance 100% of the sale price and to collect no interest for two years.

**3.** Molinaro and Mangano jointly purchased Ramona for $3.9 million. About a year later, appel-lants dissolved their partnership and Mangano sold his fifty percent interest in Ramona to Molinaro.

the United States and making false entries in Ramona's books and records.

After a four-month trial, Molinaro was convicted on all counts and Mangano was convicted on counts 1 through 31.[4] The district court sentenced Mangano to three consecutive five-year terms on the first three counts. The court suspended the imposition of sentence on the remaining counts and imposed five years probation. Molinaro received a similar sentence, except that the court imposed only a two-year term on the third count.

## II. *Bank Fraud*

Appellants challenge their convictions on the bank fraud counts on three grounds: (1) the evidence was insufficient, (2) the proof at trial constituted an amendment to or variance from the indictment, and (3) the counts were multiplicitous.

### A. *Sufficiency of the Evidence* [5]

■ Mangano argues that because he fully disclosed his participation in the transactions to Ramona's authorized representatives, the government failed to prove he defrauded Ramona. However, "[i]t is the financial institution itself—not its officers or agents—that is the victim of the fraud the statute proscribes." *United States v. Saks,* 964 F.2d 1514, 1518 (5th Cir.1992) (rejecting defendants' claim that failure to disclose a third party would be the beneficiary of a loan was not bank fraud because the banks' financial officers were aware of the fact).

Mangano argues there is no evidence he directed Ramona's representatives to conceal information from Ramona. There was evidence, however, from which a rational juror could infer Mangano was responsible for the various deceptions undertaken to defraud. Mangano was the architect of the transactions, and personally structured them in such a way that documents submitted to Ramona did not reveal his role as purchaser.[6] Marks, Ramona's loan officer, testified he expressed concern to Mangano about DeCarlo's, Dariano's and Calvello's ability to repay the loans and Mangano told him it was none of his business. The prosecution presented strong circumstantial evidence that the individuals who caused Ramona to pay the bond assessments and Robert Rumney's "consulting fee" did so on Mangano's instructions.[7]

■ Mangano argues the government offered no proof of his intent to defraud. The structure of the transactions alone suggests an intent to defraud. Moreover, Calvello testified Mangano told him it was necessary to conceal Mangano's participation in the sale because federal regulators would "frown" on the transaction. Mangano argues he had no motive to conceal his role in the sale because he no longer owned stock in Ramona and therefore Board approval was no longer required. However, Mangano sold his fifty percent interest in Ramona only a few months earlier, and clearly his purchase of one of Ramona's most substantial assets shortly thereafter would excite the Board's

---

**4.** Mangano was not charged with the false entry violations alleged in counts 32 and 33.

**5.** We review the sufficiency of the evidence "in the light most favorable to the prosecution" to determine whether "any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis omitted).

**6.** Calvello testified Mangano described the structure of the transactions to him, directed him to form the "S" corporations for the purpose of purchasing the property and supervised the execution of all documents; Norm Marks, Ramona's loan officer, and Geraldine Balough, one of Ramona's directors, testified Mangano instructed

them as to the preparation of the documents relating to the transaction; and Balough testified she prepared the documents in Mangano's offices.

**7.** Patricia Mangano testified Mangano gave her the bond assessments and told her to present them to Ramona for payment. Rumney testified that Mangano contacted him about the purchase of the Rancho Cielo property, that Mangano and Molinaro were both advised Rumney needed an extension of his outstanding loan from Ramona, and that Molinaro and Mangano told him he would need $2,000 to reactivate the corporation used for the straw purchase of Rancho Cielo. Rumney also testified documents relating to the loan extension, the $2,000 payment to Rumney and the transfer of the Rancho Cielo property were prepared in Mangano's offices.

interest and invite closer scrutiny of Ramona's solvency.[8]

### B. *Multiplicity*

■■■ Appellants argue each of counts 1 through 30 purporting to charge a violation of the bank fraud statute charges a step in the same scheme to defraud and are therefore multiplicitous.[9]

Under the heading "The Scheme," the indictment alleges that beginning in September, 1986, appellants and others "knowingly executed and attempted to execute a scheme to defraud Ramona, its officers, directors, depositors and investors, and to obtain money and property under the custody and control of Ramona by false and fraudulent pretenses and representations." The indictment continues, "the scheme involved a series of sham transactions in October, 1985 and January, 1986 whereby Molinaro and Mangano, without the knowledge or approval of Ramona's officers and directors, caused Ramona to extend loans in the total amount of approximately $29,360,000 to straw borrowers for the purpose of purchasing 173 Cherokee Village units, which were subsequently transferred to defendant Mangano. The scheme enabled defendant Mangano to secretly acquire Cherokee Village, and allowed defendant Molinaro to placate the Board by taking the Cherokee Village investment off Ramona's books." The scheme also "enabled appellants to make Ramona appear to be operating at a profit so that Ramona could be sold for $7,200,000, and defendants Molinaro and Mangano both could benefit from the proceeds of the sale."

The indictment then alleges the details of the scheme under the following headings: "OCTOBER, 1985 TRANSFERS" (describing the steps taken and documentation prepared to effectuate the transfer of 136 Cherokee Village units from Ramona to Mangano); "JANUARY, 1986 TRANSFERS" (describing the steps taken and the documentation prepared to effectuate the transfer of an additional 37 Cherokee Village units from Ramona to Mangano and to pay an assessment bond levied against collateral); "ATTEMPTED SALE OF RAMONA (describing the steps taken and documentation prepared to effectuate the sale of Ramona to Stump); and "RAMONA'S REACQUISITION OF CHEROKEE VILLAGE" (describing the steps taken and the documentation prepared to effectuate the reacquisition by Ramona of 173 Cherokee Village units).

The 30 counts alleging violations of the bank fraud statute are interspersed among the allegations describing the transactions under the first three headings. Each of these counts identifies one of the documents prepared in connection with executing the transaction described in the portion of the indictment in which the count appears and alleges the particular document was "signed and submitted to Ramona ... for the purpose of executing and attempting to execute the above described scheme to defraud and to obtain money or property by false and fraudulent representations."

The form of the indictment as a whole and of the individual counts reflects the government's preferred view that each act in fur-

---

**8.** Mangano also argues that the transactions were not so one-sided as to be fraudulent. However, proof that a transaction is one-sided, or even that the victim sustained a loss, is not a requirement under § 1344. *See United States v. Bonallo*, 858 F.2d 1427, 1433 n. 7 (9th Cir.1988).

**9.** The government argues Mangano failed to preserve the claim of multiplicity for review because he challenged only the first and not the second superseding indictment on this ground. Appellants filed and fully briefed a motion to dismiss the first superseding indictment on grounds of multiplicity. The government's second superseding indictment included two additional bank fraud counts but did not otherwise change the indictment in any substantial way. Indeed, the district judge acknowledged the two indictments

were substantially similar in his order denying the motion to dismiss, filed three months after the return of the second superseding indictment. Under the circumstances, a renewed motion to dismiss was unnecessary. *See Wood v. Alaska*, 957 F.2d 1544, 1548 (9th Cir.1992).

The government also argues Molinaro failed to preserve the multiplicity claim because he failed to join in Mangano's motion to dismiss on this ground. We conclude, however, that the need to avoid the manifest injustice that would result from treating similarly situated codefendants differently outweighs the federal interest in compliance with procedural requirements in the circumstances of this case. *See United States v. Baker*, 999 F.2d 412, 416 (9th Cir.1993).

therance of the overall scheme to defraud the bank constituted a separate violation of § 1344. The First and Fifth Circuits have rejected this view, holding that each "execution" of a scheme to defraud a financial institution, rather than each act in furtherance of such a scheme, constitutes a violation of § 1344. *See United States v. Lilly,* 983 F.2d 300, 303 (1st Cir.1992); *United States v. Lemons,* 941 F.2d 309, 318 (5th Cir.1991).[10] *See also United States v. Barnhart,* 979 F.2d 647 (8th Cir.1992) (holding each execution of a scheme is a violation of § 1344 without specifically rejecting each act in furtherance of a scheme as a violation). This interpretation is consistent with, if not required by, the words of § 1344, which provide for the punishment of "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice ... to defraud a financial institution." [11]

The government argues we are constrained by our decision in *United States v. Poliak,* 823 F.2d 371, 372 (9th Cir.1987), to interpret the bank fraud statute as we interpreted the statute on which it was modeled— the mail fraud statute—which criminalizes each use of the mails in furtherance of a scheme to defraud.

Our decision in *Poliak* does not require a holding that each act in furtherance of a scheme to defraud a financial institution is a violation of the bank fraud statute. *Poliak* involved a scheme to defraud through a check kiting scheme. Each count in *Poliak* charged the kiting of a separate check. We held the language of § 1344 "allows charging each execution of the scheme to defraud as a separate act," and that each check kiting transaction constituted "a different and separate execution of the scheme to defraud the banks." 823 F.2d at 372. As the First Circuit said in *Lilly,* in a check kiting scheme, "each check signifies a separate transaction requiring a separate issuance of money or credit on the part of the victimized bank." *Lilly,* 983 F.2d at 304; *see also Lemons,* 941 F.2d at 317 n. 5 (finding no conflict with *Poliak*).

■ Interpreting the bank fraud statute as punishing each execution of a fraudulent scheme rather than each act in furtherance of such a scheme is consistent with the Congressional intent to give the statute "the same broad scope as the mail fraud statute." *United States v. Bonallo,* 858 F.2d 1427, 1432 (9th Cir.1988).[12] This interpretation has no effect on the range of fraudulent activity within the statute's reach. *See Lilly,* 983 F.2d at 304. It affects only the number of offenses to which such activity may give rise.[13]

---

**10.** *See also United States v. Harris,* 805 F.Supp. 166, 173–74 (S.D.N.Y.1992); *United States v. Mancuso,* 799 F.Supp. 567, 570 (E.D.N.C.1992).

**11.** At the time of the bank frauds charged in Counts 1 through 30 the statute read as follows:

(a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—
(1) to defraud a federally chartered or insured financial institution; or
(2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 1108, 98 Stat. 2147 (1984) (current version in 18 U.S.C. § 1344).

**12.** The House Report states:

The new section would prohibit devising a scheme to defraud a financial institution, or to obtain property of such an institution, and engaging in conduct in furtherance of such scheme. The section thus parallels the language of the current mail fraud and wire fraud statute ("scheme to defraud"), and is intended to incorporate case law interpretations of those sections.

H.R.Rep. No. 901, 98th Cong., 2d Sess. 4 (1984). This language suggests no more than that the words "scheme to defraud" should be interpreted in the same way as they are under the mail fraud statute. The Senate Report indicates that the bank fraud statute was modeled after the mail statute because it has been construed "to reach a wide range of fraudulent activity." S.Rep. No. 225, 98th Cong., 1st Sess. 378 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3518.

**13.** Even if we could agree with the government that the intent of Congress to give the statute a broad scope provides some support for the position that each step in furtherance of a bank fraud scheme is a separate indictable offense, at best this view of the legislative history renders the language of the statute ambiguous. Faced with a statute susceptible of two reasonable interpretations, the rule of lenity requires that we choose the harsher interpretation "only when Congress

If each act in furtherance of a scheme to defraud a bank were a separate violation, a single criminal transaction could result in an infinite number of prosecutable offenses having no particular relevance to the purpose of the statute. *Lemons,* 941 F.2d at 318.[14] In contrast, permitting the prosecution of each act of mailing in furtherance of a scheme under the mail fraud statute limits the charges to conduct violative of the statute's purpose to prevent misuse of the mails and avoids the potential for an infinite multiplication of counts because the potential number of offenses is at least limited to the number of mailings.[15]

 We therefore reaffirm our holding in *Poliak* that the unit of the offense created by § 1344 is not each act in furtherance of a scheme to defraud but each execution or attempted execution of the scheme to defraud.

 "Obviously the question in each case is what constitutes an 'execution of the scheme.'" *Lemons,* 941 F.2d at 317 n. 5. The answer to that question depends upon the particular facts of each case. It is the government's "backup" argument that if each act in furtherance of the scheme does not constitute a separate offense, the allegations and proof in this case reflect five distinct executions of the scheme: (1) the transfer of 136 Cherokee Village units to Mangano alleged in counts 1 through 15; (2) the subsequent transfer of an additional 37 Cherokee Village units to Mangano alleged in counts 17 through 22; (3) the listing of DeCarlo, Dariano and Calvello as the borrowers on the

loans involved in the second transfer to make it appear they were the purchasers, as alleged in counts 23 through 28; (4) the concealment of Mangano's ownership of the five North Palm Springs parcels on which Ramona paid assessment bonds alleged in count 16; and (5) the transfer of the Rancho Cielo property to Robert Rumney alleged in counts 29 and 30.

We agree with this analysis except that we regard (2) and (3) as integral parts of a single execution of the overall scheme: the record entries involved in (3) do not constitute a new transaction; they were made solely to conceal Mangano's role in the transaction involved in (2), which had already been consummated.

With this exception, each of these executions of the overall scheme were chronologically and substantively independent. None depended on the others for its existence. Each had its own functions and purpose— they were interrelated only because they involved the same overall scheme to use Ramona's resources to finance defendants' real estate ventures.

The first transfer of 136 Cherokee Village units constituted an execution of a scheme to defraud separate from the second transfer of 37 Cherokee Village units. The second transfer of a group of Cherokee Village units was a new occasion on which concealment of Mangano's involvement was necessary to avoid Board scrutiny that would threaten defendants' ability to continue the exploitation of Ramona.[16] The payment of the bond

---

has spoken in clear and definite language." *McNally v. United States,* 483 U.S. 350, 359–60, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987).

**14.** We have sought to avoid such a result in determining whether a criminal statute permits multiple-count indictments. *See United States v. Jewell,* 827 F.2d 586, 588 (9th Cir.1987) ("If every minor action that Jewell took in relation to the contract could be considered a separate 'matter' under [18 U.S.C. § ] 208(a), his participation in the contract could be multiplied into endless criminal counts.").

**15.** The government argues the potential for infinite counts, and consequently infinite sentences, is negated by the sentencing guidelines, which require grouping of closely related counts for

purposes of sentencing. Indeed, were this a guidelines case, all thirty bank fraud counts would be grouped and the sentence would be determined by reference to the amount of the loss. U.S.S.G. §§ 3D1.2.–.3 (requiring grouping of counts where the offense level *is determined* largely on the basis of the total amount of harm, loss or quantity of substance involved, and specifically providing that crimes involving fraud and deceit are such offenses); *see also* U.S.S.G. § 2F1.1. However, because *the offense conduct* here predated the effective date of the guidelines, the sentencing guidelines have no application to this case.

**16.** These two transactions are *similar to the sep-*arate extensions of a loan agreement found to be separate executions of a scheme to defraud in

assessment on Mangano's property, execution (4), and the Rumney transactions, execution (5), were distinct in time and purpose from the Cherokee Village sales and from each other. The objective of the former was simply to cause Ramona to pay bond assessments on Mangano's property; the objective of the latter was to facilitate the sale of Ramona to Stump.

## C. Constructive Amendment or Prejudicial Variance

██ Mangano argues the government changed the theory of its case on the bank fraud counts—that the indictment alleged a scheme to defraud Ramona but the government's proof related to a scheme to defraud the Board. Mangano argues this change in theory constituted either a constructive amendment of the indictment not approved by the grand jury or a prejudicial variance between the allegations and the proof at trial.[17] Neither occurred.

██ Mangano argues that by relying on misrepresentations made to the Board rather than Ramona to support counts of the indictment alleging violations of § 1344, the prosecution constructively amended those counts to charge a new offense since § 1344 applies only to fraud against a bank, not against a governmental agency.

Mangano relies on United States v. Blackmon, 839 F.2d 900 (2d Cir.1988). The fraud alleged in Blackmon was directed only against customers of the bank and did not expose the bank to a risk of loss. Id. at 904–05. See also United States v. Hubbard, 889 F.2d 277, 280 (D.C.Cir.1989) (distinguishing Blackmon because the bank in Hubbard was exposed to a risk of loss by defendant's theft and fraudulent negotiation of a check). Here, in contrast, Ramona was plainly the victim of appellants' fraud; their conduct directly jeopardized the bank's solvency.

The fact that appellants' misrepresentations were designed to conceal their fraudulent conduct from the Board does not mean the appellants defrauded only the regulators. Concealment of Mangano's role from the Board was one facet of a scheme to use Ramona's deposits to engage in real estate transactions that jeopardized Ramona's assets. Appellants could continue to use Ramona's deposits to finance their real estate ventures only so long as they were able to conceal Ramona's financial instability from federal regulators and thus avoid what eventually occurred—the closing of Ramona by the Board. Appellants cannot escape liability for this scheme to defraud Ramona simply because effectuating the scheme also required them to conceal the true nature of their transactions from the Board.

Nor was there a variance between indictment and proof. The scheme alleged in the indictment plainly included concealment of the true nature of the Cherokee Village sales from the Board.[18]

## III. Conspiracy

██ Mangano argues the government failed to prove the existence of an agreement

Harris. See 805 F.Supp. at 174–75. The defendants in Harris were charged with misrepresenting the net worth of their corporation in obtaining a loan and six separate extensions of that loan. The court found the loan and each extension constituted a line of credit for a limited period. Each request for an extension was a new occasion for the bank to consider extending the limited period. The defendants were faced with a new obligation to be truthful regarding their corporation's net worth each time they sought an extension. Id. at 175. Mangano appears to argue that because the transactions had a single purpose—the acquisition of Cherokee Village—they must be a single execution of a scheme to defraud. However, as the analysis in Harris demonstrates, two transactions may have a common purpose but constitute separate executions of a scheme where each involves a new and independent obligation to be truthful.

17. A constructive amendment occurs when the proof at trial supports a crime other than the crime charged in the indictment. United States v. Pisello, 877 F.2d 762, 765 (9th Cir.1989). A variance occurs when "the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." United States v. Von Stoll, 726 F.2d 584, 586 (9th Cir. 1984) (quoting United States v. Cusmano, 659 F.2d 714, 718 (6th Cir.1981)).

18. For example, the indictment alleged appellants intended to "placate the Board by taking Cherokee Village off Ramona's books," (Indictment ¶ 19), and to conceal Mangano's participation because the transaction would have been "frowned on" by federal regulators had they known the purchaser was Mangano, (Indictment ¶ 24).

with Molinaro to accomplish either of the alleged objectives of the conspiracy: (1) to defraud the United States by impeding, impairing, obstructing and defeating the performance by the Board of its lawful function and (2) to defraud Ramona by making false entries in its books and records relating to Mangano's sale of the Cherokee Village units back to Ramona.

The jury could infer the existence of an agreement between Molinaro and Mangano to impede the operation of the Board from the abundant evidence that they joined in structuring the transactions and preparing the necessary documentation in such a way as to conceal Mangano's participation from the Board. Although Molinaro instructed Patricia Mangano to make the entries in Ramona's records and the notation on the check, the jury could infer Molinaro and Mangano agreed to the instruction from the evidence of Mangano's underlying control of the sale and his motive to conceal his role in it.

## IV. *Jury Instructions*

### A. *Intent to Defraud*

Appellants argue the district court improperly refused to instruct the jury that to convict the defendants of a violation of subsection (2) of the bank fraud statute it must find Ramona was deceived by the fraudulent misrepresentations.[19] With respect to subsection (2) of the bank fraud statute, the jury was instructed it must find the defendants engaged in "a scheme to obtain money or property from Ramona by false representations or pretenses." Appellants argue that, because the district court failed to add "to Ramona," the instruction permitted the jury to find appellants guilty of bank fraud solely on the basis of misrepresentations to the Board.

Appellants rely upon our statement in *United States v. Lew*, 875 F.2d 219, 221 (9th Cir.1989), that the mail fraud statute requires proof of an intent "to obtain money or property from the one who is deceived." In *Lew*, we reversed a mail fraud conviction of an immigration attorney charged with filing false applications to the Department of Labor on behalf of his clients because the district court explicitly directed the jury it could find the defendant guilty of a scheme to defraud his clients of money or property without finding the defendant made any false representations to his clients.

In determining whether the district court correctly explained the law, "we may look beyond the instructions themselves and examine the indictment and the entire trial in context." *United States v. Dischner*, 974 F.2d 1502, 1520 (9th Cir.1992) (citation and internal quotation marks omitted). Viewing the entire charge in the context of the whole trial, the jury could not have been confused as to the victim of the fraud. *See id.* (affirming a mail fraud instruction that the jury must find the "defendant acted with the intention of obtaining money or property by means of false statements" even though the court did not add "from or to the alleged victim" where, "[g]iven the way the case was charged and tried, the jury could not have been confused as to the victim of the fraud."). As alleged in the indictment and argued to the jury, the bank fraud scheme involved the submission by appellants to Ramona of loan applications and other documents that fraudulently concealed the identity of the true purchaser of Cherokee Village. Appellants did not dispute the fact that the documents alleged to be false were submitted to Ramona. Accordingly, if the jurors found those documents contained fraudulent omissions and misrepresentations there could be no confusion that those misrepresentations were made to Ramona.[20]

---

**19.** The jury was instructed correctly with respect to subsection (1), which makes punishable the execution of a scheme to defraud a bank and does not require proof of a misrepresentation. *See United States v. Ragosta*, 970 F.2d 1085, 1089 (2d Cir.1992). The jury was instructed the scheme must be to defraud Ramona.

**20.** While the prosecution may have emphasized in its closing argument that appellants deceived the federal regulators, it did so because the scheme to defraud Ramona necessarily included deceiving the Board, and, more importantly, because the indictment also charged appellants with a conspiracy to defraud the United States.

## B. *Good Faith Instruction*

Appellants argue that the district court's good faith instruction was erroneous because: (1) the judge refused to instruct the jury that a good faith belief in the economic viability of the transaction would be a defense to bank fraud, and (2) the judge did not remind the jury that all the elements of the crime must be proven beyond a reasonable doubt. Neither claim has merit.

■ The court gave the following instruction:

> You may determine whether a defendant had an honest, good faith belief in the truth of the specific misrepresentations alleged in the indictment in determining whether or not the defendant acted with intent to defraud. However, a defendant's belief that the victim of the fraud will be paid in the future or will sustain no economic loss is no defense to the crimes charged in the indictment.

The court's instruction accurately stated the law. "While an honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all." *United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir.1986).

Appellants argue the fraud charged in this case is like that involved in a check-kiting scheme where a good faith belief in repayment is a defense. As the court said in *Benny*, "[i]f the defendant reasonably believed he or she could cover [the check], there was no intentional misrepresentation and hence no crime." *Id.* This is plainly not such a case. Appellants' belief in the economic viability of the transactions would not make their concealment of Mangano's role in those transactions unintentional. In any event, as noted in *Benny*, "[n]o court has extended the repayment defense beyond check-kiting cases." *Id.*

■ The court's failure to remind the jury that all elements of the crime must be

proven beyond a reasonable doubt was not error: the court expressly instructed the jury to this effect on several other occasions.[21]

## V. *Admission of Evidence of Prior Bad Acts*

■ Mangano argues that evidence of certain dividend payments he and Molinaro received from Ramona was irrelevant and inadmissible under Fed.R.Evid. 404(b), which bars admission of evidence of "crimes, wrongs, or acts" to prove an individual's propensity to commit the crime charged. *See United States v. Sarault*, 840 F.2d 1479, 1485 (9th Cir.1988). The evidence was relevant to prove appellants' intent. Appellants argued in their opening statement they could not have intended to defraud Ramona because they had invested their own money in Ramona and any losses to the bank would fall upon them. Evidence that Molinaro and Mangano had taken dividends from the bank exceeding their original $2,000,000 investment undermined this claim.

Mangano also argues the dividend payments were not prior *bad* acts because the payments were lawful. Prior acts need not be unlawful to be admissible under Rule 404(b)—the rule refers to evidence of other "crimes, wrongs, or *acts*." (Emphasis added). The critical requirement is that the evidence be offered for a purpose other than to prove the defendant's propensity to engage in the conduct charged.

## VI. *Presence of Alternate Jurors During Deliberations*

■ Federal Rule of Criminal Procedure 24(c) provides that "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." Over the government's objection, appellants' attorneys asked that the alternate jurors be permitted to remain in the jury room during deliberations. The district

---

21. Molinaro alleges various other errors with respect to the district court's formulation of the jury instructions. None has merit.

judge granted the request and instructed the alternate jurors to remain in the jury room but not to participate in the deliberations or indicate their views. Appellants argue that in the absence of personal consent by the defendants themselves, the presence of alternates requires reversal *per se.*

The Supreme Court's decision in *United States v. Olano,* —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), controls this case. The attorneys in *Olano,* like counsel here, consented to the presence of the alternate juror and the juror was instructed not to participate in deliberations, but the defendants did not personally consent to the procedure. The Supreme Court assumed without deciding that Rule 24(c) is nonwaivable, but held the defendants were not entitled to relief absent a showing they were prejudiced by the alternate's presence during deliberations. *Id.* —— U.S. at ——, 113 S.Ct. at 1779–81. Appellants, too, have failed to demonstrate prejudice from the alternates' presence.

### VII. *Denial of Molinaro's Suppression Motion*

■■■ Molinaro challenges the denial of his motion to preclude the prosecution from using statements he made in the course of plea negotiations for impeachment or as investigative leads.

The court's ruling was not error with respect to the statements Molinaro made after he signed the plea agreement. The prosecution expressly reserved the right to use these statements against Molinaro if he breached the plea agreement, and Molinaro breached the agreement by withdrawing his guilty plea.

Molinaro claims the prosecutor gave him use immunity with respect to statements he made prior to signing the plea agreement. However, the district court found as a matter of fact that the prosecution expressly reserved the right to use the statements for impeachment purposes and investigative

leads; and the court's finding was not clearly wrong.

### VIII. *Application of the Sentencing Guidelines*

The district court did not err in refusing to sentence Mangano pursuant to the Sentencing Guidelines. The conduct alleged occurred between 1984 and 1986. The guidelines apply only to offenses committed on or after November 1, 1987. *United States v. Rewald,* 835 F.2d 215, 216 (9th Cir.1987), *amended* 902 F.2d 18 (9th Cir.1990).

### *Conclusion*

The judgment is **AFFIRMED,** except that the sentences are vacated and the case is **REMANDED** for resentencing. Since the government's proof at trial was sufficient on each of the counts, although some of the counts charging a scheme to defraud under 18 U.S.C. § 1344 are multiplicitous, and also on each of the executions of the scheme, a sentence can be imposed on each count but must run concurrently with every other sentence on a count that is part of the same execution. As we have said, counts 1–15 relate to a distinct execution of the scheme, count 16 is a distinct execution of the scheme, counts 17–28 constitute a distinct execution of the scheme, and counts 29–30 charge a distinct execution of the scheme. Counts 31, 32, and 33 charge offenses other than executions of the scheme to defraud under § 1344. We vacate the sentences on these counts as well because they may have been influenced by the judge's interpretation of the unit of the offense under § 1344.