**UNITED STATES of America**

v.

**Robert WIEHL, Sharon A. Connor, and Roger Cramp, Defendants.**

**No. 94–CR–443.**

United States District Court, N.D. New York.

Oct. 23, 1995.

Emil M. Rossi, Syracuse, New York, for Defendant Wiehl.

Bond, Schoeneck & King, LLP, Syracuse, New York (George H. Lowe, of counsel), for Defendant Connor.

Edward Menkin, Syracuse, New York, for Defendant Cramp.

Thomas J. Maroney, United States Attorney, Syracuse, New York (Michael C. Olmstead, Robertson T. Park, Assistant U.S. Attorneys, of counsel), for U.S.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

Defendants are charged, inter alia, with twelve counts of major fraud against the government for allegedly submitting false and fraudulent invoices to the Army. In the instant motion defendants seek dismissal of these counts on the ground that they are multiplicitous. The court heard oral argument on September 18, 1995, at Syracuse, New York. The following constitutes the court's Memorandum–Decision and Order.

## FACTS

Defendants Robert Wiehl, Sharon A. Connor and Roger Cramp are Chief Financial Officer, Supervisor of Marketing Administration and Manager of Manufacturing, respectively, for Lipe–Rollway Corporation. Indictment, Document ("Doc.") 1, at 2. Rollway Bearing, a division of Lipe–Rollway, manufactures roller bearings for military and commercial customers. In August 1990, the government awarded a prime contract to Lipe–Rollway for the production of 3,275 roller bearings for use in Army helicopters, at a cost of $930,034.50. *Id.* at 3. Under the terms of the contract, Lipe–Rollway was required to deliver the first 400 roller bearings 570 days from the date the contract was executed. The contract also required production of a single prototype roller bearing for inspection and testing by the Army prior to full-scale production.

In November 1990, the Army agreed to Lipe–Rollway's request to modify the contract by waiving the prototype requirement. *Id.* at 3. The modification included a stepped-up schedule requiring delivery to commence on May 26, 1991. Defendants revised internal production schedules, notified contract vendors, and purchased raw materials to meet the new production delivery schedule.

In January 1991, the Army asked Lipe–Rollway to expedite production and make the first delivery of roller bearings before May 26. *Id.* at 4. From January through April 1991, defendants negotiated with the Army over additional costs defendants claimed were necessary to meet the stepped-up delivery schedule. On April 22, 1991, a second contract modification was executed requiring Lipe–Rollway to deliver 400 roller bearings on or before May 20, 1991. *Id.* at 4. The Army agreed to pay an additional $353,176, an amount defendants claimed was necessary to meet the accelerated delivery schedule. In return, Lipe–Rollway was required to submit proposed cost modifications to the Army. The contract also required Lipe–Rollway to submit a "Defense Form 250, Material Inspection and Receiving Report," ("invoice") for payment. *Id.* at 5, 10–11.

It is alleged that defendants conspired to defraud the government by submitting inflated invoices to the Army. As part of the scheme, defendants allegedly obtained and used false Lipe–Rollway overtime labor cost estimates and false vendor quotes to support their request for additional money. *Id.* at 6. Defendant Connor falsely stated to Army representatives that certain vendors were charging Lipe–Rollway premium costs to place Lipe–Rollway's contract ahead of others. *Id.* at 9. Connor negotiated a lower packaging cost with one of the vendors, but concealed this fact from the Army when she submitted a cost estimate for the modification of the contract. *Id.* at 9. It is further alleged that prior to execution of the second contract modification defendant Wiehl directed Lipe–Rollway employees to stop delivery and conceal from Army representatives about 400 fully assembled roller bearings that were ready for inspection and shipping. *Id.* at 9.

In count one of the indictment, the government contends that the above acts constitute a willful conspiracy by defendants to defraud the government, in violation of 18 U.S.C. § 371. *Id.* at 5.

In counts two and three of the indictment, the government alleges that defendants used false documents in a contract with the gov-

ernment in violation 18 U.S.C. §§ 1001–02 when on or about March 13 and April 4, 1991, defendants submitted to the Army pricing proposals, signed by defendant Connor. Those proposals contained cost breakdown information and vendor quotes that were fictitious and unnecessary to performance of the contract. *Id.* at 11–12.

Defendants are charged in counts 4 through 15 of the indictment with attempting to execute major fraud against the government in violation of 18 U.S.C. § 1031, commonly known as the Major Fraud Act. They allegedly used false and fraudulent estimates of overtime labor and outside vendor costs that they claimed were necessary to meet a stepped-up delivery schedule under the contract, and by billing the Army for those expenses. *Id.* at 13–17. Counts 4 through 15 specifically charge defendants with submitting 12 invoices between April 30 and November 4, 1991 to the Army seeking payment under the contract. *Id.* at 13–17. *See also* Exhibit ("Exh.") B, attached to Defendant ("Def.") Connor's Notice of Motion, Doc. 13.

Lastly, defendants are charged in counts 16–25 with mail fraud for their use of the mails in furtherance of the alleged scheme to defraud the government. Indictment, Doc. 1, at 17–19.

The court turns to the merits of defendants' motion seeking dismissal of counts 4–15 of the indictment on the ground that they are multiplicitous.

## DISCUSSION

■ "Multiplicity" is the charging of a single offense in more than one count. "The multiplicity doctrine is based upon the double jeopardy clause of the Fifth Amendment, which 'assur[es] that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.'" *United States v. Fiore*, 821 F.2d 127, 130 (2d Cir.1987) (quoting *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977)). In addition to the double jeopardy problem, the evil in charging a single offense in more than one count is that it may create the impression of more criminal activity on the part of the defendants than in fact may

have occurred. *See* 1 Charles A. Wright, Federal Practice and Procedure: Criminal, § 142 (1982). With regard to the major fraud statute in particular, a multiplicitous indictment also subjects the defendants to a substantially greater monetary penalty. The major fraud statute provides for a possible fine of $1 million for each execution of a scheme to defraud, with a maximum fine not exceeding $10 million for multiple counts. 18 U.S.C. § 1031(a) and (c).

The government argues that under the major fraud statute multiple *acts* in execution of a single fraud scheme may be charged as separate offenses. Thus, on the facts before the court each submission of a fraudulent invoice by defendants in a scheme to defraud the Army may be charged as a separate offense. In support, the government relies on two district court cases in this circuit that rejected multiplicity challenges under the major fraud statute. Also, the government claims that the plain language of the statute and its legislative history unambiguously shows that multiple acts in execution of a single major fraud scheme may be charged as separate offenses.

Defendants do not dispute that multiple violations of the major fraud statute may be charged for multiple executions of a single scheme, but contend that the statute does not punish discrete *acts* in carrying out the execution of a scheme. Def. Connor's Memorandum ("Mem.") of Law, Doc. 14, at 4. According to defendants, the indictment "describes a single alleged scheme to defraud, and twelve clerical [and] administrative acts in furtherance of the scheme." *Id.* at 5.

The instant motion presents the court with two issues. First, the court must decide whether the major fraud statute punishes multiple acts done in furtherance of a scheme to defraud the government, or whether it only seeks to punish each execution of a scheme. Secondly, once the appropriate unit of prosecution has been determined, the court must determine whether the indictment charging defendants with one count of major fraud for each submission of an invoice to the government is multiplicitous. The court to addresses these issues in turn.

## A. Act v. Execution

### i. Plain language and legislative history of Major Fraud Act

■ Whether an indictment is multiplicitous is largely a question of statutory construction. *See United States v. DeStafano,* 429 F.2d 344, 348 (2d Cir.1970) (citing *Callanan v. United States,* 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961), *cert. denied,* 402 U.S. 972, 91 S.Ct. 1656, 29 L.Ed.2d 136 (1971)). The government contends that both the plain language of the major fraud statute and its legislative history show that multiple acts in execution of a single major fraud scheme may be charged as separate offenses. Government's ("Gov.") Opposition to Def. Connor's Motion to Dismiss, Doc. 16, at 6–8.

The Major Fraud Act, provides in relevant part:

(a) Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent—

(1) to defraud the United States; or

(2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises,

in any procurement of property or services as a prime contractor with the United States ... if the value of the contract ... is $1,000,000 or more shall ... be fined not more than $1,000,000, or imprisoned not more than 10 years, or both.

(c) The maximum fine imposed upon a defendant for prosecution including a prosecution with multiple counts under this section, shall not exceed $10,000,000.

18 U.S.C. § 1031.

The government argues that the fine limitation language unambiguously shows that the 12 inflated and fraudulent invoices defendants submitted to the Army for payment constitute 12 separate acts in furtherance of the major fraud scheme. Gov.'s Opposition to Def. Connor's Motion to Dismiss, Doc. 16, at 7–8.

As to the legislative history of the major fraud statute, in discussing the fine limitation set forth in paragraph (c), the Senate Report states:

This provision was included to address a concern that the government may charge *in a single judicial proceeding* that *a large number of related incidents are separate violations of this section.* The committee determined that ... the aggregate of fines that a court may impose under this section in a single judicial proceeding is $10 million for any single defendant, regardless of the number of counts or violations of this section which are alleged.

S.Rep. No. 100–503, 100th Cong., 2d Sess. 12 (1988), *reprinted in* U.S.C.C.A.N. 5969, 5976 (emphasis added to original). The government argues that the highlighted language clearly shows that Congress intended "multiple acts in execution of a major fraud scheme to constitute plural offenses as opposed to a single crime." Gov.'s Opposition to Def. Connor's Motion to Dismiss, Doc. 16, at 8.

■ In the case at bar, the court is unable to conclude from the language of the statute or its legislative history that the submission of fraudulent invoices comes within the "large number of related incidents" that Congress contemplated could be charged as separate violations of the major fraud statute. While both the plain language of the statute and the legislative history make clear that Congress contemplated the possibility of the government charging "multiple counts" of major fraud in one judicial proceeding, neither the statute nor the legislative history answer the question as to what constitutes an *execution* of a scheme. What the government fails to point out is that the statute expressly mentions the execution of a scheme to defraud the government, not "acts" in furtherance of a scheme. Likewise, the legislative history does not directly address what constitutes an execution of a scheme. While the statute expressly contemplates charging multiple counts of major fraud in one judicial proceeding, the court cannot reasonably infer from the statute's language or legislative history what constitutes an execution of a scheme to defraud within the context of the facts presently before the court.

■ The rule of lenity weighs in defendants' favor. In *United States v. Plaza Health,* the court stated

In criminal prosecutions the rule of lenity requires that ambiguities in the statute be resolved in the defendant's favor. In other words, we cannot add to the statute what congress did not provide. "[B]efore a man can be punished as a criminal under the Federal law his case must be 'plainly and unmistakably' within the provisions of some statute."

*United States v. Plaza Health Laboratories, Inc.,* 3 F.3d 643, 649 (2d Cir.1993) (citations omitted). It is not clear from the language of the major fraud statute or its legislative history whether the statute contemplates the charging of multiple acts in furtherance of a scheme. Assuming for the sake of argument that the legislative history of the major fraud statute lends some support to the view that each act in furtherance of a scheme to defraud is a separate indictable offense, that view makes ambiguous the language of the statute. Faced with conflicting reasonable interpretations of the statute, the rule of lenity requires that the court choose the one that is to defendants' disadvantage "only when Congress has spoken in clear and definite language." *McNally v. United States,* 483 U.S. 350, 359–60, 107 S.Ct. 2875, 2881–82, 97 L.Ed.2d 292 (1987). The court is unable to conclude from either the plain language of the major fraud statute or its legislative history that Congress clearly intended to punish each act in furtherance of a scheme to defraud.

### ii. Case law

The government relies heavily on the two reported cases that have considered the multiplicity issue within the framework of the major fraud statute. In *United States v. Broderson,* a corporate officer was charged with eleven counts of major fraud in a scheme in which separate invoices were submitted to the government that reflected inflated financing rates. *United States v. Broderson,* No. CR 93–1177, 1994 U.S.Dist. LEXIS 12982, at *2 (E.D.N.Y. April 1, 1994), *remanded on other grounds,* 67 F.3d 452 (2d Cir.1995). The defendant moved for either consolidation of the counts into one count or for the dismissal of the counts as multiplicitous.

After quoting both the language of the major fraud statute and its legislative history the *Broderson* court concluded, without further discussion, that the "submission of each invoice submitted pursuant to the alleged scheme to defraud constitutes a separate violation of § 1031." *Broderson,* 1994 U.S.Dist. LEXIS 12982, at *2. The court's conclusion, however, does little more than beg the question by assuming the truth of what is sought to be proven, in the effort to prove it.

In *United States v. Frequency Electronics,* 862 F.Supp. 834 (E.D.N.Y.1994), the district court rejected a multiplicity challenge to an indictment charging as separate crimes multiple acts in execution of a major fraud scheme. Defendants in that case submitted inflated expense claims in connection with six separate contracts with the government. The court rejected the defendant's argument that the separate submissions constituted one execution of a single scheme to defraud.

The court first held that "whatever *acts* taken or attempted by [the defendant] in order to fulfill the purpose of a scheme to defraud the United States on the . . . contracts may properly be called executions of that scheme under the major fraud act." *Id.* at 839. In reaching this conclusion the court analogized the major fraud statute to the mail and wire fraud statutes which punish each *act* performed in violation of the statutes. *Id.* at 846. The *Frequency Electronics* court then concluded that "[e]ach separate submission by [the defendant] of materials to supplement its remuneration claim made in furtherance of a scheme to defraud the government on the . . . contracts constitutes a distinct execution . . . of the scheme." *Id.* at 846.

This court disagrees with the analysis used by the court in *Frequency Electronics.* First, that court's decision to analogize the major fraud statute to the mail and wire fraud statutes is thinly reasoned. The Senate Report's only reference to the mail and wire fraud statutes is the following: "[t]he phrase 'scheme or artifice' should be interpreted in the same manner as that phrase in interpreted under the mail and wire fraud statutes." S.Rep. No. 100–503, 100th Cong., 2d Sess. 12 (1988), *reprinted in* U.S.C.C.A.N.

5975. While the language of the mail and wire fraud statutes is similar to the major fraud statute, it is not identical. The mail fraud statute, for example, seeks to punish "[w]hoever, having devised or intending to devise any scheme or artifice to defraud ... for the purpose of executing such scheme or artifice or attempting to do so, *places in any post office ... any matter or thing whatever.*" 18 U.S.C. § 1341 (emphasis added to original). The major fraud statute, in contrast, proposes to punish "[w]hoever knowingly executes ... any scheme or artifice with the intent ... to defraud the United States," 18 U.S.C. § 1031. While the mail fraud statute criminalizes each use of the mails in furtherance of a scheme to defraud, (*see United States v. Lilly,* 983 F.2d 300, 303 (1992) (Selya, J.) and cases cited therein), it is not clear from the language of the major fraud statute that the latter criminalizes discrete acts taken in furtherance of a scheme. *See Lilly,* 983 F.2d at 303 (rejecting argument that bank fraud statute should be construed in pari passu with the mail and wire fraud statutes).

The court finds support for the conclusion that the major fraud statute does not punish acts taken in furtherance of a scheme to defraud in cases construing the bank fraud statute. The major fraud statute seeks to punish "[w]hoever knowingly executes ... any scheme or artifice with the intent ... to defraud the United States." 18 U.S.C. § 1031. In comparison, the bank fraud statute proposes to punish "[w]hoever knowingly executes ... a scheme or artifice ... to defraud a financial institution." 18 U.S.C. § 1344. Because the language of the bank fraud statute is very similar to the language of the major fraud statute, the cases construing the former statute provide some insight with regard to the issues presently before the court.

In discussing the multiplicity issue within the context of the bank fraud statute, several courts have dealt directly with the narrower issue of whether the statute punishes separate *acts* in execution of a scheme to defraud, or whether the statute punishes the *execution* of a scheme to defraud. Without exception those courts have concluded that the bank fraud statute seeks to punish each execution of a scheme. *See United States v. Lemons,* 941 F.2d 309, 318 (5th Cir.1991); *United States v. Heath,* 970 F.2d 1397, 1401 (5th Cir.1992) (en banc), *cert. denied sub nom. Cheng v. U.S.,* —— U.S. ——, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993); *United States v. Lilly,* 983 F.2d 300, 303–04 (1st Cir.1992); *United States v. Molinaro,* 11 F.3d 853, 859–60 (9th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 668, 130 L.Ed.2d 602 (1994). In rejecting the argument that the bank fraud statute punishes individual acts, these courts rejected, for substantially the same reasons discussed above by this court, the argument that the statute should be analogized to the mail and wire fraud statutes.

In defining the term "execute", the *Frequency Electronics* court also looked to the Black's Law Dictionary definition: "to fulfill ... the purpose of." *Id.* at 839. From this partial definition, the court concluded that the term execute must encompass any acts taken in order to fulfill the purpose of a scheme to defraud the United States. *Id.* at 839. It is instructive to examine the complete definition of "execute" contained in Black's Law Dictionary:

> To complete; to make; to sign; to perform; to do; to follow out; to carry out according to its terms; to fulfill the command or purpose of. To perform all necessary formalities, as to make and sign a contract, or sign and deliver a note. *See also* Execution.

Black's Law Dictionary, 567 (6th ed. 1990) (citations omitted). The term "execution" is defined as

> Carrying out some act or course of conduct to its completion. Completion of an act. Putting into force. The completion, fulfillment, or perfecting of anything, or carrying it into operation and effect.

*Id.* at 568.

■ Unlike *Frequency Electronics* court, this court does not conclude that the term "execute" encompasses *any* acts taken in furtherance of a scheme to defraud. Rather, the dictionary definitions cited above support the conclusion that the term encompasses the set of acts that are necessary to complete or fulfill the purpose of a scheme to defraud.

■ Because the court is neither bound by nor finds sufficient guidance in *Frequency Electronics* and *Broderson,* this court declines to follow those cases. Therefore, for the reasons stated above, the court holds that the major fraud statute punishes each execution of a scheme to defraud the government, not individual acts in the furtherance of each execution. The court must next determine whether the indictment charging defendants with one count of major fraud for each submission of an invoice to the government is multiplicitous.

## B. *Multiplicitous Counts*

■ In determining whether the indictment charging defendants with multiple counts of major fraud is multiplicitous the court again turns to cases discussing the multiplicity issue in the context of the bank fraud statute. Determining what constitutes an "execution" depends upon the particular facts of each case. *See e.g., United States v. Wall,* 37 F.3d 1443, 1446 (10th Cir.1994); *Lilly,* 983 F.2d at 303; *Heath,* 970 F.2d at 1402; *Lemons,* 941 F.2d at 318; *Molinaro,* 11 F.3d at 859–60. The Eighth Circuit held that "the first step in determining the number of offenses is to ascertain the contours of the scheme; once that is done, each execution of that scheme is a separate offense." *United States v. Rimell,* 21 F.3d 281, 287 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 453, 130 L.Ed.2d 362 (1995), *petition for rehearing denied,* —— U.S. ——, 115 S.Ct. 784, 130 L.Ed.2d 677 (1995). The First Circuit stated that the central question is "whether a jury could plausibly find that the actions described in the [disputed] counts of the indictment, objectively viewed, constituted separate executions of the [bank fraud] scheme." *Lilly,* 983 F.2d at 303 (alteration in original).

In determining the unit of offense created by the bank fraud statute, courts have looked to a variety of factors. For example, one court examined whether the scheme involved more than one transaction, bank or sum of money. *Lilly,* 983 F.2d at 304 (finding a single execution of a scheme where the defendant "assigned to a single bank a single package of documents that consistently misstated a single material fact in order to obtain a single loan, the proceeds of which funded a single real estate purchase"). Another court held that two separate loans from a single bank constituted a single execution of a scheme because the two loans were "integrally related; one could not have succeeded without the other." *Heath,* 970 F.2d at 1402.

By contrast, in *United States v. Poliak,* 823 F.2d 371 (9th Cir.1987), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988), the defendant set up a check-kiting operation involving three checking accounts at three separate banks in the names of three fictitious businesses. The defendant was charged with ten counts of bank fraud, one for each check written during the scheme. The court held that each time the defendant wrote a check, a separate execution of the scheme to defraud occurred. *Id.* at 372.

Likewise, several courts have held that multiple transactions may have a common purpose but constitute separate executions of a scheme when each transaction involves a new and separate obligation to be truthful. *Molinaro,* 11 F.3d 853; *United States v. Harris,* 805 F.Supp. 166 (S.D.N.Y.1992). In *Harris,* the defendants were charged with misrepresenting the net worth of their corporation to obtain a loan and with six separate extensions of that loan. The court concluded that "[e]ach separate extension of the original loan agreement was a separate execution of the charged scheme to defraud the banks." *Id.* at 175. The court reasoned that the defendants were under a new obligation to be truthful each time that they sought an extension. *Id.*

The government argues that cases construing the bank fraud statute demonstrate that it is the "movement" of money between financial institutions that constitutes a separately chargeable execution of a scheme to defraud. See Gov.'s Opposition to Def. Connor's Motion to Dismiss, Doc. 16, at 12, and cases cited therein. The government concludes that the submission of each invoice is properly charged as a separate execution of the scheme because each invoice sent to the Army caused the movement of money from

the Army to defendants. *Id.* at 13. The court disagrees. None of the cases cited by the government justify the conclusion that the mere movement of money constitutes a separately chargeable execution of a scheme. Rather, courts that considered the issue have found that the movement of money is a relevant *factor* in determining whether a single or multiple executions of bank fraud have occurred. This was the reasoning used in *United States v. Brandon,* 17 F.3d 409, 422 (1st Cir.1994), *cert. denied sub nom. Ward v. United States,* ── U.S. ──, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994), a case relied upon by the government, in which the court said that "the number of movements of money involved in the scheme" was a factor, among others, in determining whether the charge was multiplicitous. *Id.* at 422 (citing *Lilly,* 983 F.2d at 305). The *Brandon* court went on to reason that "[e]ach time an identifiable sum of money is obtained by a specific fraudulent transaction, there is *likely* to be a separate execution of the scheme to defraud." *Brandon,* 17 F.3d at 422 (emphasis added to original). Significantly, in finding that a scheme to defraud was not multiplicitous, the *Brandon* court reasoned further that

> the scheme was not designed to get a set amount, or a preconceived sum of money. Instead, the scheme functioned by obtaining as many loans as possible depending on the number of buyers [the defendant] could recruit to apply for the mortgages. The structure of the scheme was such that individual buyers would be brought in to submit separate loan applications which would be fraudulently prepared and then sent on to [the bank] for approval and the disbursement of the funds for that individual sale. [The bank] approved each loan separately based on each individual application and each loan corresponded to an individual piece of property, that is, a separate condominium unit. Objectively viewed, each loan application appears to be a repeated execution of the basic scheme and not simply an additional step or stage of one unitary transaction. Although only one bank was involved in the scheme, there were over 176 separate loans to 79 different buyers involving many separate move-

ments of money from [the bank] to the mortgage brokers and from the mortgage brokers to [the defendant] during the fifteen months in which the scheme was in operation.

*Brandon,* 17 F.3d at 422.

■ The important lesson to be drawn from cases dealing with the multiplicity issue is that the court's analysis should not turn on any one factor. The touchstone of any multiplicity analysis should be whether the acts in question, considering all of the relevant factors, constitute single execution or multiple executions of a scheme to defraud.

Several courts considering the issue of whether a particular act constitutes an "execution" within the meaning of the bank fraud statute have applied an "interrelatedness" standard. *See e.g., Heath,* 970 F.2d at 1402 (counts were multiplicitous because two loans "were integrally related; one could not have succeeded without the other"); *Molinaro,* 11 F.3d at 860; *Wall,* 37 F.3d at 1446. Indeed, in cases in which courts found no multiplicity, those courts typically focused on whether the acts within a particular scheme were related in any essential way. For example, in *Molinaro,* the Ninth Circuit found no multiplicity and explained:

> [E]ach of these executions or the overall scheme were chronologically and substantively independent. None depended on the others for its existence. Each had its own functions and purpose—they were interrelated only because they involved the same overall scheme to use [the victim's] resources to finance defendants' real estate ventures.

*Molinaro,* 11 F.3d at 860. In *Wall,* the Tenth Circuit found no multiplicity and described the executions of the scheme as follows:

> Each loan was made entirely separately from the other and involved different borrowers, with no evident connection to each other. Each involved a separate movement of money, and each, standing alone, put the bank at risk of loss. The loans *were not themselves related in any essential way.*

*Wall,* 37 F.3d at 1446 (emphasis added to original).

Defendants characterize the government's allegations with regard to defendants' submission of the 12 invoices as "integral parts of a single overall scheme" in which each submission was necessary to complete and fulfill the alleged scheme to defraud the government. Defendants further argue that when the second contract modification was executed in April 1991, they allegedly "falsely certified to costs that were necessary in order to expedite the production of certain roller bearings." For purposes of the instant motion it is significant that defendants executed a contract in April 1991, before delivery of the roller bearings, for a fixed price of $1,283,210. Defendants note that to collect on that fixed contract price, Lipe–Rollway was *required* under the terms of the contract to submit at least one invoice to the Army. Def. Connor's Reply Mem. of Law in Support of Motion to Dismiss, Doc. 19, at 9; Indictment, Doc. 1, at 5, 10–11. The scheme therefore was designed to obtain a set amount of money from the government. Cf. *Brandon,* 17 F.3d at 423 (that the scheme was not designed to get a preconceived sum was a factor in finding no multiplicity under the bank fraud statute).

As a further consideration, the court is troubled by the possible inconsistent results obtained by the government's focus on each submission of an invoice. During oral argument the government acknowledged that if defendants had waited until completion of the contract to submit an invoice for the total contract price, then defendants would have been charged with only one count of major fraud. However, defendants find themselves charged with multiple counts of major fraud because they submitted an invoice with each shipment of roller bearings. The different results are unjust. By focusing on the discrete acts done in furtherance of the scheme to defraud, as opposed to the execution of the contract for example, the government is able to manipulate the number of counts and subject defendants to the maximum penalty.

In a closely related point, it is not apparent to the court why the government chose to charge defendants with submission of the invoices and not some other act done in furtherance of the scheme. The indictment alleges that defendants did the following as "part of the scheme and artifice to defraud" the government: 1) submitted fraudulent invoices to Army representatives; 2) obtained and used false and fraudulent LIPE–ROLLWAY overtime labor cost estimates and vendor quotes in the course of negotiating the contract modification and in support of additional funding; and 3) prior to the execution of the modified contract, caused LIPE–ROLLWAY employees to stop the delivery of and conceal fully assembled roller bearings that were ready for shipment. Indictment, Doc. 1, at 14–16. However, the government only charged defendants for each submission of a fraudulent invoice to the Army. But if the major fraud statute contemplates charging defendants for each act in furtherance of a scheme to defraud, why should the government stop with the invoices? For example, if the court were to adopt the government's view, then defendants could also have been charged for their use of false and fraudulent LIPE–ROLLWAY overtime labor cost estimates and vendor quotes in the course of negotiating the contract modification. Further, it is reasonable to suppose that defendants could have been charged for their concealment of the fully assembled roller bearings.

The government's argument also seems to compel the conclusion that defendants could have been charged with one count of major fraud for the submission of each pricing proposal. In counts 2 and 3 of the indictment defendants were charged with the submission of false and fraudulent writings and documents to the Army. These proposals contained cost breakdown information and vendor quotes that were allegedly fictitious and unnecessary to performance of the contract. Certainly if each submission of a false invoice constitutes an act in furtherance of the scheme, then it must be equally true that the submission of false pricing proposals constitute acts in furtherance of the same scheme. It is difficult to conceive any scheme, under the government's interpretation of the major fraud statute, that would not subject a defendant to the maximum level of monetary punishment.

■ Viewing the circumstances as a whole, and in view of all the relevant factors discussed above, the court holds that the invoices submitted by defendants constituted a single execution of a scheme to defraud the government within the meaning of the major fraud statute. The court further holds that counts 4 through 15 of the instant indictment are multiplicitous and violate defendants' 5th Amendment constitutional right against double jeopardy.

■ Although defendants request the dismissal of counts 4 through 15 as multiplicitous, the court believes that it is in the interests of justice to consolidate the 12 counts into a single count. It is within the court's discretion to order the government to "elect among the multiplicitous counts, with all but the one elected dismissed." *United States v. Reed,* 639 F.2d 896, 904, n. 6 (2d Cir.1981) (citing 1 Charles Wright, Federal Practice and Procedure, § 145). *See also United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952); *United States v. Ketchum,* 320 F.2d 3, 8 (2d Cir.1963) (citing *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. at 225, 73 S.Ct. at 231); *United States v. Greenberg,* 30 F.R.D. 164, 170–71 (S.D.N.Y.1962) (dismissing separate counts and consolidating them into a single count). The government is therefore ORDERED to consolidate the major fraud counts into one count.

### CONCLUSION

In sum, the court GRANTS defendants' motion to the extent that the government is ORDERED to elect one count from counts 4 through 15 into which the remaining counts are to be consolidated. All but the one count elected by the government are hereby DISMISSED as multiplicitous in that they violate defendants' 5th Amendment constitutional right against double jeopardy.

It is so ORDERED.