### UNITED STATES of America

v.

### Joseph MERMELSTEIN, Defendant.

### No. 05 CR 0037(SJ).

United States District Court, E.D. New York.

May 2, 2007.

Roslynn R. Mauskopf, United States Attorney Eastern District of New York, by Charles S. Kleinberg, Esq., Brooklyn, NY, for the United States.

Bracewell & Giuliani LLP, by Jonathan N. Halpern, Esq., New York, NY, for the Defendant.

## MEMORANDUM AND ORDER

JOHNSON, Senior District Judge.

Presently before the Court is a Report and Recommendation ("Report") prepared by Magistrate Judge Steven M, Gold.[1] Judge Gold filed the Report on March 16, 2007, and provided the parties with the requisite amount of time to file any objections. Joseph Mermelstein ("Defendant") and the government timely filed their objections to the Report on April 20, 2007. For the reasons stated herein, this Court affirms and adopts the Report in its entirety.

A district court judge may designate a magistrate judge to hear and determine certain motions pending before the Court and to submit to the Court proposed findings of fact and a recommendation as to the disposition of the motion. *See* 28 U.S.C. § 636(b)(1). Within 10 days of service of the recommendation, any party may file written objections to the magistrate's report. *See id.* Upon *de novo* review of those portions of the record to which objections were made, the district court judge may affirm or reject the recommendations. *See id.* The Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the report and recommendation to which no objections are addressed. *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435(1985).

In his Report, Judge Gold made the following recommendations:

(1) Defendant's motion to dismiss the first superseding indictment ("S–1") be granted with respect to the serious bodily injury charge in Count One, and in all other respects be denied;

(2) Defendant's motion to dismiss the second superseding indictment ("S–2") be granted to the extent that;

(a) the government be precluded from proving or arguing at trial that the injuries sustained by patients N.S., J.R., F.L. and M.S. constitute serious bodily injuries as charged in Count Two of S–2;

(b) the government be permitted to prove or argue at trial that the injury sustained by patient V.D. constitutes a serious bodily injury as charged in

---

1. The Court thanks Judge Gold for his efforts in this regard.

Count Two of S–2 only upon a proffer demonstrating that a finder could reasonably conclude that the injury satisfies the definition set forth in 18 U.S.C. § 1365(h)(3);

(c) the government's proof with respect to Count Four be limited to conduct that took place on or after July 30, 3002;

(d) the government be precluded from proving or arguing at trial that Defendant's statements and production of records to the Office of Professional Misconduct of the New York State Department of Health ("OPMC") constitute a violation of 18 U.S.C. § 1035 as charged in Count Three;

and in all other respects be denied;

(3) Defendant's motion to compel discovery about why the indictment in this case was signed by a designee of the United States Attorney and not by the United States Attorney herself be denied;

(4) Defendant's challenge to the admissibility of the statements he made and the records he produced to the OPMC be denied;

(5) Defendant's challenge to the admissibility of evidence of his affair with Josephine Crone be denied;

(6) Defendant's challenge to the admissibility of evidence of the "early" fraudulent claims and false statements be denied;

(7) Defendant's challenge to the admissibility of evidence concerning his treatment of patient Elizabeth McTigue and records relating to that treatment be granted;

(8) The government's application for a ruling that entries in Defendant's medi-cal records be admitted for their truth be deferred until trial; and

(9) Defendant's motion to preclude the government's expert testimony be denied in its entirety.

Defendant argues in his objections to the Report that the government should not be allowed to offer Defendant's statements to OPMC as proof of a § 1035 conspiracy,[2] and that the government should not be allowed to offer any evidence of an alleged affair between Defendant and Josephine Crone. The government argues in its objections to the Report that a certain portion of the McTigue evidence, namely the evidence, including McTigue's first hand eyewitness testimony, showing that Defendant did not take McTigue's eye pressures ("McTigue Eye Pressure Evidence") should not be precluded.

After reviewing the Judge Gold's Report and the parties' objections, and after reviewing *de novo* those portions of the record to which the objections were made, the Court concludes that neither party has raised any arguments that would convince this Court to reject Judge Gold's well-reasoned recommendations. Accordingly, the Court affirms and adopts the Report in its entirety.

Finally, to the extent that the government's argument that the Court should not preclude the McTigue Eye Pressure Evidence amounts to a separate motion *in limine* to admit such evidence, the government's motion is denied for substantially the same reasons Judge Gold set forth in his Report for precluding the government from introducing the broader category of McTigue evidence. Specifically, the McTigue Eye Pressure Evidence is criminal propensity evidence that does not fall with-

---

**2.** This is an objection to recommendation (4), above, which is clearly distinct from recommendation (2)(d).

in any category listed in Federal Rule of Evidence 404(b). Moreover, any probative value of admitting such evidence pales in comparison to its prejudicial value.

SO ORDERED.

## REPORT AND *RECOMMENDATION*

GOLD, United States Magistrate Judge.

### Introduction

Defendant Joseph Mermelstein is charged in Count One of a second superseding indictment with conspiring to make false statements in connection with the delivery of and payment for health care benefits in violation of 18 U.S.C. §§ 1035(a)(2) and 371; in Count Two, with executing and attempting to execute a scheme to defraud health care benefit programs in violation of 18 U.S.C. § 1347; in Count Three, with making false statements in matters involving health care benefit programs in violation of 18 U.S.C. § 1035(a)(1) and (2); and in Count Four, with destroying, altering, and falsifying records involved in an investigation and the proper administration of matters within the jurisdiction of the United Stated Department of Health and Human Services ("HHS") and the Federal Bureau of Investigation ("FBI") in violation of 18 U.S.C. § 1519. The second superseding indictment ("S–2") was filed on November 6, 2006. *See* Docket Entry 116. A first superseding indictment ("S–1") containing the same charges but fewer factual details was filed on November 3, 2005. *See* Docket Entry 55.

The charges against Mermelstein, a physician, arise from his ophthalmology practice. S–1, ¶ 1; S–2, ¶ 1. The government alleges that Mermelstein executed a scheme to submit fraudulent claims for payment on behalf of his practice to Medicare and various non-Medicare health care benefit programs. According to the indict-ments, Mermelstein submitted claims for services he never provided and for services he stated were medically necessary but were not. S–1, ¶¶ 6–7; S–2, ¶¶ 5–6. The indictments further charge that Mermelstein falsified and altered medical records submitted in conjunction with the fraudulent claims for payment. These records were maintained by Mermelstein to document the treatment upon which the fraudulent claims were based. S–1, ¶ 9; S–2, ¶ 8.

Defendant Mermelstein has moved to dismiss various aspects of the charges against him and to exclude certain expert testimony the government intends to offer against him at trial. The government has filed in limine motions raising several additional evidentiary issues. During a conference held on November 17, 2006, Senior United States District Judge Sterling Johnson, Jr., referred the parties' motions to me for report and recommendation. I heard oral argument on the motions on February 14, 2007. This report sets forth my recommendations with respect to those aspects of the parties' motions which were not resolved during the oral argument.

### Defendant's Motion to Dismiss the Indictment

Defendant moves to dismiss the charges against him on several grounds. Because Mermelstein argues, among other things, that certain charges are barred by the statute of limitations, and because some of the conduct at issue took place within five years of the filing of S–1 but more than five years before S–2 was filed, I consider the validity and sufficiency of the first superseding indictment as well as the second.

### A. *Specificity*

Defendant argues that neither S–1 nor S–2 provide sufficient detail to put him on notice of the charges against him and allow

him to prepare a defense. Mermelstein further argues that the indictments are not specific enough to ensure that he will be convicted of charges actually presented to the grand jury and to protect against double jeopardy in future prosecutions. Finally, defendant argues that the shortcomings of S–1 and S–2 are not cured by the bills of particulars and other discovery provided by government. For reasons set forth below, I conclude that the allegations of both S–1 and S–2 (other than, as discussed below, the serious bodily injury allegations of S–1), particularly when considered in light of the discovery produced by the government, are sufficiently specific to withstand defendant's challenge.

■ An indictment need contain only "a plain, concise, and definite written statement of the essential facts." Fed R.Crim. P. 7(c). An indictment is sufficiently specific when it sets forth the elements of the charged offense and "inform[s] the defendant of the charges he must meet ... with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *U.S. v. Walsh*, 194 F.3d 37, 44 (2d Cir.1999), *quoting U.S. v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). *See also Hamling v. U.S.*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). In addition, the indictment must "contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Walsh*, 194 F.3d at 44, *quoting U.S. v. Abrams*, 539 F.Supp. 378, 384 (S.D.N.Y.1982).

■ The Second Circuit has "consistently upheld" indictments that "track the language of the statute charged" and "state the time and place (in approximate terms) of the alleged crime." *Walsh*, 194 F.3d at 44–45 (holding that an indictment which described the victim, the manner, and the

time period of an alleged assault was sufficient). Although "a bill of particulars cannot save an invalid indictment," *Russell v. U.S.*, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962), where an indictment is "minimally sufficient," a court may look to the entire record, including a bill of particulars or other discovery, to determine whether the defendant has received adequate notice of the specific charges to prepare his defense and protect against double jeopardy. *Walsh*, 194 F.3d at 45; *U.S. v. McClean*, 528 F.2d 1250, 1257 (2d Cir.1976) ("[Because] particular facts needed in particular cases are obtainable by bills of particulars or discovery, we have repeatedly refused, in the absence of any showing of prejudice, to dismiss similarly-couched charges [i.e., charges which simply track the applicable statutory language] for lack of specificity.") (internal citations and quotation marks omitted).

■ In this case, the government has provided extensive discovery and detailed bills of particulars. In its so-called Fraudulent Claims Bill of Particulars, the prosecution has set forth the allegedly fraudulent claims it intends to prove at trial by patient name and indicated the health care benefit program to which the claim was submitted, the dates of submission and payment, the diagnostic code, and whether the submission was fraudulent because the services described were not performed, not medically necessary, or over-billed. In a second chart it labels a False Statements Bill of Particulars, the prosecution has detailed the false statements it alleges defendant made in his charts by patient name. The government's disclosure includes the date on the chart, the statement alleged to be false, and, in some cases, whether the chart was "altered" or "re-written" and to whom the chart was submitted.

■ A defendant who seeks to dismiss an indictment based on lack of specificity must identify particular portions of the indictment that lack requisite detail and explain why greater specificity is required. *U.S. v. Crowley*, 236 F.3d 104, 109 (2d Cir.2000); *U.S. v. Gruttadauria*, 439 F.Supp.2d 240, 246 (E.D.N.Y.2006). Defendant contends that each count of S–1 and S–2 is insufficiently specific. I examine each count below. *Health Care Fraud Allegations*

Count One of S–1 and Count Two of S–2 charge the defendant with a continuing "scheme" to violate the health care fraud statute, which provides in relevant part as follows:

Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1347.

■ A scheme proscribed by Section 1347 may properly be charged as a continuing offense. *U.S. v. Refert*, 2007 WL 30292, *2 (D.S.D. Jan.3, 2007) (finding that health care fraud under 18 U.S.C. § 1347 is a continuing offense for purposes of a statute of limitations challenge and citing a case supporting that conclusion from the Ninth Circuit); *see also U.S. v. Lauersen*, 1999 WL 637237, *7 (S.D.N.Y. Aug.20, 1999) (rejecting ex post facto challenge on the grounds that a conspiracy to violate 18 U.S.C. Sections 1347 and 1035 was a continuing offense). Courts have held that an indictment charging a continuing offense or scheme may properly leave the delineation of the specific executions or actions that are part of that offense to a bill of particulars, as long as the indictment itself sets out all of the elements of the crime and meets other constitutional requirements. *U.S. v. Upton*, 856 F.Supp. 727, 740 –741 (E.D.N.Y.1994). The Court in *Upton*, in the context of a different continuing offense statute, stated:

With the information supplied by the bill of particulars, defendants are now on notice as to which wire communications were used to further the scheme outlined in Count Two of the Superseding Indictment and cannot now argue that they are not in a position to prepare an adequate defense.

*Id.* at 741.

In this case, the health care fraud counts in both S–1 and S–2 meet the constitutional requirements for specificity, particularly when considered in light of the bills of particulars provided by the government. The health care fraud counts of S–1 and S–2 allege (1) the time frame of the scheme (January of 1990 to April of 2005), (2) the scheme's victims (health care benefit programs, including Medicare, Medicaid and numerous specifically identified private health insurance plans), (3) the perpetrators of the scheme (Joseph Mermelstein and his office manager, Josephine Crone), (4) the place where the scheme was perpetrated (Mermelstein's office for the practice of ophthalmology on Victory Boulevard in Staten Island), (5) the purpose of the scheme (to obtain money from benefit plans to which Mermelstein was not entitled), and—perhaps most significantly—(6) the means by which the scheme was carried out (submitting claims for payment fraudulently stating that Mermelstein had

provided medical services to patients when in fact he did not, or that the services he actually did provide were medically necessary when in fact they were not). In addition, both S–1 and S–2 track the language of the statute and thereby set out the essential elements of the offense. These facts, taken in conjunction with the details provided in the Fraudulent Claims Bill of Particulars described above, provide the defendant with more than adequate notice to prepare a defense.

*Conspiracy to Make False Statements and Making False Statements*

 Counts Two and Three of S–1 and Counts One and Three of S–2 charge the defendant with conspiring to make false statements in violation of 18 U.S.C. §§ 371 and 1035. An indictment charging conspiracy is sufficient if it tracks the language of the statute and alleges all of the essential elements of conspiracy, which are:

> (1) an agreement between the defendant and at least one other person to commit an offense; (2) that the defendant knowingly participated in the conspiracy with the specific intent to commit the illegal object of the conspiracy, and; (3) that during the conspiracy an overt act in furtherance of the illegal objective was committed by a member of the conspiracy.

*U.S. v. Zandstra,* 2000 WL 1368050, *3 (S.D.N.Y.2000), *citing United States v. Salameh,* 152 F.3d 88, 145–46 (2d Cir.1998). Like the indictment held sufficient in *Zandstra,* the indictment in this case

> tracks the conspiracy statute, . . . alleges each of the essential elements of the crime of conspiracy, states the nature of the fraudulent scheme that was the subject of the conspiracy [making false statements in connection with the delivery and payment for health care services], specifies the ap-

proximate time period during which the conspiracy took place [January 2000 through April 2005], states the place from which the scheme was allegedly operated [Mermelstein's office and elsewhere], and specifies overt acts that furthered, and effected the illegal objects of, the conspiracy [altering medical records of various patients].

*Zandstra,* 2000 WL 1368050, at *3. Accordingly, the conspiracy charge is sufficiently specific.

 A false statement charge, like a charge of health care fraud, need not specify in the indictment the particular false statements upon which the charge is based. Rather, identifying the statements by category is sufficient, at least where an accompanying bill of particulars identifies the specific false statements the government will attempt to prove at trial. *U.S. v. Gabriel,* 920 F.Supp. 498, 508 (S.D.N.Y. 1996).

Both S–1 and S–2 sufficiently describe the time period and nature of the false statements charged, namely "false and misleading statements concerning services provided to, test results obtained for, medications prescribed for, and events that occurred during the examinations of medicare and non-medicare beneficiaries," made between January of 2000 and April of 2005. S–1, ¶ 16; S–2, ¶ 18. In addition, the False Statement Bill of Particulars, as noted above, identifies each false statement the government will attempt to prove at trial, and specifies why the government contends the statement is false. Taken together, the indictment and bill of particulars are thus more than sufficient to put the defendant on notice of the charges against him and enable him to prepare his defense.

*Destruction, Alteration, and Falsification of Records*

Count Four is sufficiently specific for largely the same reasons.[1] Count Four charges a violation of 18 U.S.C. § 1519, which punishes an individual who:

> knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States

18 U.S.C. § 1519. Count Four is sufficient because it not only tracks the language of the statute, but also alleges the time frame over which the crime is alleged to have occurred (January of 2002 to April of 2005), the agencies whose investigations and proper administration the defendant attempted to obstruct (HHS and the FBI), and the type of records at issue (records relating to the treatment of insured patients). *See Walsh,* 194 F.3d at 44–45. Moreover, the overt acts in furtherance of the conspiracy, each of which is incorporated by reference in Count Four, provide examples of defendant's alleged falsification and alteration of records. S–2, ¶¶ 14, 19–20; Gov't Mem. Opp'n Def. Mot. to Dismiss at 13. Finally, the government has identified the records it alleges Mermelstein altered or falsified in its False Statements Bill of Particulars. Particularly in light of the details provided in paragraph 14 of the second superseding indictment and in the False Statements Bill of Particulars, defendant's challenge to the specificity of Count Four should be rejected. *See Gabriel,* 920 F.Supp. at 508.

In short, a plain reading of either indictment makes it clear that Mermelstein is charged with fraudulently billing health care benefit programs for services he never provided to his patients or which his patients did not really need, and with creating, and conspiring with his office manager to create, false medical records to support his fraudulent claims. The bills of particulars provided by the government identify in detail the fraudulent claims and false statements with which Mermelstein is charged, and explain what about them the government contends is untrue. I therefore recommend that Mermelstein's motion to dismiss the charges against him for lack of specificity (other than the serious bodily injury charge discussed below) be denied.

**B. *Ex Post Facto Clause and Statute of Limitations***

*Section 1347—Health Care Fraud Charge*

As previously stated, Count Two of the second superseding indictment (and Count One of the first superseding indictment) charge Mermelstein with executing and attempting to execute a scheme to defraud health care benefit programs in violation of 18 U.S.C. § 1347 from 1990 to 2005. Section 1347, however, was enacted in 1996, after the scheme charged in the indictment began. Moreover, the applicable limitations period is five years, 18 U.S.C. § 3282, but as noted above, the first and second superseding indictments were not filed until November of 2005 and November of 2006, respectively.

---

**1.** Count Four of S–2 alleges that Mermelstein altered and destroyed records from January 2002 through April 2005. Because all of the charged conduct took place within five years of the filing of S–2, I do not address the sufficiency of Count Four as charged in S–1. Moreover, I note that the effective date of 18 U.S.C. § 1519 was July 30, 2002, and that the government does not contend that this count charges a continuing offense. Accordingly, the conduct alleged to have been committed in violation of Count Four should be limited to acts of the defendant which took place on or after July 30, 2002.

In its bill of particulars and other discovery, the government has identified numerous allegedly fraudulent claims submitted by Mermelstein and the payments he received as a result of those claims, many of which occurred more than five years before the filing of the first or second superseding indictment and, in some cases, prior to the effective date of Section 1347. Based upon these facts, Mermelstein contends that the health care fraud charge is barred by the Ex Post Facto Clause of the Constitution and the statute of limitations, at least with respect to those allegedly fraudulent claims that were submitted and paid prior to the effective date of Section 1347 or more than five years prior to the filing of indictment.

■ By its express terms, the Ex Post Facto Clause of Article One, Section 10 of the Constitution limits the power of Congress. Its protections, however, extend to judicial proceedings as a matter of due process. *U.S. v. Harris*, 79 F.3d 223, 228–229 (2d Cir.1996), *citing Marks v. United States*, 430 U.S. 188, 191–92, 97 S.Ct. 990, 992–93, 51 L.Ed.2d 260 (1977). Thus, the Ex Post Facto Clause prohibits imposing criminal liability if to do so:

> (1) makes an act a crime that was legal when committed; (2) makes a crime greater than it was when it was committed; (3) increases the punishment for a crime after it has been committed; or (4) deprives the accused of a legal defense that was available at the time the crime was committed.

*Harris,* 79 F.3d at 228, *citing Collins v. Youngblood,* 497 U.S. 37, 41–42, 110 S.Ct. 2715, 2718–19, 111 L.Ed.2d 30 (1990).

■ Continuing offenses, such as health care fraud, bank fraud, and crimes under the Major Frauds Act [2] do not violate the Ex Post Facto Clause if the criminal behavior alleged in the indictment continues beyond the effective date the relevant statute, and are not barred by the statute of limitations if the alleged conduct continues to a date within the limitations period. *U.S. v. Duncan,* 42 F.3d 97, 104 (2d Cir.1994), *citing United States v. Torres,* 901 F.2d 205, 226 (2d Cir.1990), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 ("[C]ontinuing offenses such as conspiracy and bank fraud do not run afoul of the *Ex Post Facto* Clause if the criminal offenses continue after the relevant statute becomes effective."). *See also Toussie v. U.S.,* 397 U.S. 112, 115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970) (noting that statutes of limitations normally do not begin to run

---

**2.** Because of the similarity in the wording of the bank, major, and health care fraud statutes, courts rely upon the more ample case law construing the former two statutes when interpreting 18 U.S.C. § 1347. *See, e.g., Refert,* 2007 WL 30292, at *2 ("The health care fraud statute is modeled after the bank fraud statute, 18 U.S.C. § 1344, and the bank fraud statute was modeled after the federal mail and wire fraud statutes, §§ 1341 and 1343.") (internal quotes omitted). *See also U.S. v. Wiehl,* 904 F.Supp. 81, 87 (N.D.N.Y.1995) (holding that "[b]ecause the language of the bank fraud statute is very similar to the language of the major fraud statute, the cases construing the former statute provide some insight with regard to the issues presently

before the court[,]" but finding that relying on precedent involving the mail and wire fraud statutes may not be appropriate); *U.S. v. Frequency Electronics,* 862 F.Supp. 834, 838–839 (E.D.N.Y.1994) (holding that the phrase "scheme or artifice" in the Major Frauds Act should be interpreted in light of case law construing the mail and wire fraud statutes); *U.S. v. Reitmeyer,* 356 F.3d 1313, 1317 (10th Cir.2004) (construing the major fraud statute by reference to case law interpreting the "nearly identical language found in the bank fraud statute"); *U.S. v. Hickman,* 331 F.3d 439, 445–446 (5th Cir.2003) (interpreting health care fraud statute in line with the bank fraud statute based on the "almost identical" "language and structure" of the two statutes).

until the charged crime is completed); *Refert*, 2007 WL 30292, at *1–2 (recognizing that health care fraud may be a continuing offense and, applying the analysis in *Toussie*, rejecting a claim that an indictment charging multiple transactions in one count, some of which took place beyond the limitations period and some within it, was time-barred).

The health care fraud statute applies to any person who "knowingly and willfully executes, or attempts to execute, *a scheme* or artifice" to defraud "health care benefit programs." 18 U.S.C. § 1347 (emphasis added). Defendant Mermelstein argues that each allegedly fraudulent claim and resulting payment constitutes a separate "execution" of the scheme charged in the indictment, and thus a completed crime. *See* Def. Reply Mem. Supp. Mot. to Dismiss at 4–5. Mermelstein contends that it follows from this premise that those executions completed before the effective date of Section 1347 or more than five years before the filing date of the indictment are barred by the Ex Post Facto Clause or the statute of limitations.

Courts, however, have repeatedly held that an indictment brought under the health care fraud, bank fraud, or major fraud statutes may properly charge, in a single count, a pattern of executions, or submissions of fraudulent claims, as part of a single, overarching continuing scheme. For example, the Seventh Circuit, addressing a claim that a bank fraud charge was duplicitous, held that:

> [F]or each count of conviction, there must be an execution. However, the law does not require the converse: each execution need not give rise to a charge in the indictment. The indictment in this case sets forth the existence of a scheme and alleges the scheme was executed on at least one occasion. The allegations tending to demonstrate the existence of the scheme do appear to be allegations that, if worded and structured differently, might constitute additional executions. This is hardly surprising; the actions that tend to prove the existence of the scheme will often be the actions actually taken to execute the scheme. Nonetheless, we believe the government has carefully crafted the indictment to allege only one execution of an ongoing scheme that was executed numerous times.

*U.S. v. Hammen*, 977 F.2d 379, 383 (7th Cir.1992). *See also U.S. v. King*, 200 F.3d 1207,1212–1213 (9th Cir.1999) (following the reasoning in *Hammen* and holding that the deposit and attempted deposit of a series of bogus checks was properly charged in one count, because each execution of a scheme to commit bank fraud need not give rise to a separate charge); *U.S. v. Bruce*, 89 F.3d 886, 889–890 (D.C.Cir.1996) (holding that, although multiple executions of a single scheme might be charged in separate counts, they need not be, and upholding an indictment charging in one count of bank fraud four loan applications made to different branches of the same bank over a three-month period); *U.S. v. Klein*, 2004 WL 1191962, *4 (S.D.N.Y. May 27, 2004) (invoking the reasoning in *King* and *Hammen* to reject a duplicity challenge to an indictment charging the exchange of numerous checks with a face value of tens of millions of dollars in one count of bank fraud, and further pointing out that pleading multiple executions in furtherance of a single scheme in one count is desirable because it avoids dangers of cumulative punishment and multiplicity), *citing U.S. v. Tutino*, 883 F.2d 1125, 1141 (2d Cir.1989); *U.S. v. Wiehl*, 904 F.Supp. 81, 89 (N.D.N.Y.1995) (addressing a challenge to an indictment on grounds of multiplicity by applying a fact-specific analysis to determine whether acts

were properly charged in separate counts under the Major Fraud Act); *U.S. v. Frequency Electronics*, 862 F.Supp. 834, 839 (E.D.N.Y.1994) (finding charges were neither multiplicitous nor barred by the Ex Post Facto Clause in light of the indictment's definition of the scheme charged). *But see U.S. v. Hinton*, 127 F.Supp.2d 548, 556 (D.N.J.2000) (finding an indictment that charged in one bank fraud count a scheme to defraud several banks, involving 128 transactions and nine confederates, was duplicitous, and requiring the government to seek an appropriate superseding indictment).

Mermelstein relies heavily on the Fifth Circuit's unpublished opinion in *U.S. v. Kirkham*, 129 Fed.Appx. 61 (5th Cir. 2005).[3] The holding in *Kirkham*, however, does not support defendant's position as strongly as he contends. The indictment in *Kirkham* listed thirteen false claims in a single count of health care fraud. As in *Hammen*, which it cited favorably, the *Kirkham* court noted that, while the government may charge each execution of a health care fraud in a separate count, it need not do so. *Kirkham*, 129 Fed.Appx. at 67. Although it ultimately found the indictment flawed, the court based its conclusion on the failure of the indictment "to identify one specific transaction that constituted the execution of the scheme on which the jury must agree before convicting," and not on the listing in one count of multiple transactions as examples of executions of the charged scheme. *Id.* at 69. Finally, the court apparently did not consider whether, as suggested below, a special jury interrogatory could have been employed to identify one or more specific transactions "on which the jury ... agree[d]" before convicting. *Id.* at 67.

The substantial weight of authority permits the government to charge a single scheme consisting of several transactions in one count of health care fraud, particularly on facts like those alleged here. The indictment defines a single scheme to defraud health care benefit programs, perpetrated through an ongoing pattern of narrowly defined criminal behavior emanating from Mermelstein's ophthalmology practice, with the assistance of a single identified confederate. Particularly because the scheme was perpetrated in essentially the same manner throughout the period charged in the indictment, the submission of the various fraudulent claims identified in the government's fraud bill are properly charged as part of a single continuing offense that was not completed until after the health care fraud state was enacted and well within the limitations period.

Moreover, in charging these fraudulent submissions in a single count, the government has prevented the prejudice to the defendant that would surely result were he charged in separate counts, and exposed to separate penalties, for each of the many fraudulent claims he is accused of submitting. The government has also avoided the potential multiplicity challenge that would undoubtedly follow had the indictment been crafted as defendant suggests. Finally, any concerns that the defendant may have about being convicted solely on the basis of acts that took place before the effective date of the statute or outside the period of limitations may be avoided by submitting special interrogatories to the jury. *See Klein*, 2004 WL 1191962, at *5 (finding the same with respect to a duplicity challenge); *Zandstra*, 2000 WL 1368050, at *5 (same).

---

**3.** As an unpublished opinion, *Kirkham* may be cited only "pursuant to Fed. R.App. P. 32.1(a)." Fifth Cir. R. 47.5.4. Fed. R.App. P. 32.1(a) states that a court may not restrict the citation of judicial opinions, even if they are designated as "unpublished."

I therefore respectfully recommend that defendant's motion to dismiss the Section 1347 charge in the indictment on ex post facto and statute of limitations grounds be denied.

### Sections 371 and 1035—Conspiracy and False Statements Charges

Mermelstein also challenges the timeliness of the conspiracy and false statement charges alleged in Counts One and Three of S–2 and Counts Two and Three of S–1. These counts charge Mermelstein with making false statements, and conspiring to do so, from January of 2000—a date more than five years before S–1 was filed—and April of 2005.

Defendant's limitations argument fails for the same reasons discussed above with respect to Section 1347: Section 1035 may properly be charged as a continuing offense. The language of Section 1035(a)(1) mirrors that of 18 U.S.C. § 1001(a)(1), which has been more frequently litigated.[4] Both sections provide that a defendant may be charged in one count with a *scheme* comprised of several acts of falsification or concealment. *U.S. v. Hubbell,* 177 F.3d 11, 13–14 (D.C.Cir.1999) (finding that Section 1001 permits the government to charge a defendant with an ongoing scheme that would not violate the statute of limitations even if the charged conduct began before the limitations period, and further holding that multiple acts of falsification were properly charged in a single count); *see also U.S. v. Heacock,* 31 F.3d 249, 256 (5th Cir.1994) (holding that 18 U.S.C. § 1001 is a continuing offense and that the limitations period applicable to a Section 1001 charge does not begin to run until all acts in furtherance of the scheme have been committed); *U.S. v. Schumann,* 2006 WL 642565, *2 (N.D.Ill. Mar.8, 2006) (same).

■ To the extent that defendant contends that acts in furtherance of the conspiracy charged in Count One of S–2 fall outside of the limitations period, the same reasoning applies. It is well settled that conspiracy is a continuing offense, and that an indictment may properly plead overt acts outside the limitations period. *U.S. v. Fletcher,* 928 F.2d 495, 498 (2d Cir.1991) (holding that "[t]he limitations period begins to run after the last overt act in furtherance of the main goals of the conspiracy"), *citing Grunewald v. United States,* 353 U.S. 391, 396–97, 77 S.Ct. 963, 969–70, 1 L.Ed.2d 931 (1957).

### Section 1519—Alteration and Falsification of Records Charge

Count Four charges defendant Mermelstein with altering and falsifying records. As indicated above in footnote one, the effective date of 18 U.S.C. § 1519 is July 30, 2002. The government does not contend that this count charges a continuing offense. Accordingly, the conduct alleged to have been committed in violation of Count Four should be limited to acts of the defendant that took place on or after July 30, 2002.

### C. Allegations of Serious Bodily Injury

A defendant convicted of violating Section 1347 may be sentenced to a term of imprisonment of up to ten years. However, "[i]f the violation results in serious bodily injury," the maximum penalty is increased to twenty years of imprisonment. The government charges in Count One of S–1 and Count Two of S–2 that defendant's health care fraud resulted in serious bodily injury. Defendant challenges the serious bodily injury allegations on several grounds.

---

**4.** Count Three of S–2 charges defendant with violating 1035(a)(1) and (2).

I review defendant's contentions with respect to the indictment's serious bodily injury charge with particular care because of the substantial potential prejudice the charge poses. As discussed above, the government's case is essentially one of fraud. The allegation that defendant's misconduct caused one or more of the patients under his care to suffer serious bodily injury is a more serious charge than one of fraud and, if not properly lodged, might improperly influence the jury's consideration of the fraud charges. *Cf. U.S. v. Williams*, 205 F.3d 23, 34 (2d Cir.2000) (finding no undue prejudice under Federal Rule of Evidence 403 when evidence at issue did not involve conduct more serious than the charged crime).

Defendant's first argument is that the serious bodily injury charge lacks sufficient specificity. Because defendant also challenges the serious bodily injury charge on limitations grounds, I consider the sufficiency of both S–1 and S–2.

 The serious bodily injury charge in S–1 merely tracks the statutory language without identifying the patients or bodily injuries upon which it is based. The indictment does not indicate the number of serious bodily injuries the government alleges resulted from Mermelstein's fraud, when the injuries were sustained, who sustained them, or what type of injuries they were. Indeed, the indictment provides no information other than that the fifteen-year fraudulent scheme charged allegedly "resulted in serious bodily injury." S–1, ¶ 11.

These deficiencies are especially troubling in light of the length of the charged scheme and the large number of patients treated by the defendant over that time. *Cf. Walsh*, 194 F.3d at 44 (finding an indictment sufficiently specific because it

identified the assault victims, the manner in which the assault occurred, the time when the assault occurred, and the victim's body position during the assault). Although the government contends that it has provided defendant with detailed particulars identifying five patients and the serious injuries it will attempt to prove they sustained, Gov't Mem. Opp'n Def. Mot. to Dismiss at 8, I find S–1 so deficient that it cannot be saved by the government's disclosures. *See Russell*, 369 U.S. at 770, 82 S.Ct. 1038 (holding that a bill of particulars will not save an invalid indictment). For all these reasons, I conclude that S–1 lacks sufficient detail to enable Mermelstein to prepare his defense or protect against double jeopardy.

In S–2, the government sets forth the specific dates and descriptions of five injuries, although it does not identify the patients involved by name. S–2, ¶¶ 9–11. The identities of the patients have, however, been disclosed in discovery. In light of the additional details in S–2, I conclude that the serious bodily injuries alleged by the government are sufficiently described. *See Walsh*, 194 F.3d at 44.

Some of the injuries the government seeks to rely upon at trial were apparently sustained more than five years before S–2 was filed. Not surprisingly, defendant contends that proof of these injuries should be precluded on limitations grounds.

S–2 identifies five patients who, according to the government, suffered serious bodily injuries as a result of the defendant's scheme to defraud. Two of these patients, N.S. and J.R.,[5] had cataract surgeries in August of 2000 and July of 2001, respectively, that the government contends were not medically necessary and resulted in a condition known as herpetic keratitis.

---

**5.** I refer to the patients by their initials to protect their privacy.

S–2, ¶ 9; Def. Mem. Supp. Mot. to Dismiss at 9. Both procedures were performed more than five years before S–2 was filed. It therefore seems that proof of these injuries should be precluded by the statute of limitations.

■■■ In an effort to save these charges, the government reiterates its argument that a scheme to defraud health care benefit programs is a continuing offense, and that acts committed outside the limitations period may therefore be charged as criminal conduct if the scheme continued into the limitations period. In other words, the government contends that serious bodily injuries, even if sustained outside the limitations period, may properly be charged because the injuries resulted from a scheme to defraud being prosecuted under Section 1347 as a continuing offense. This argument raises the question whether, when a statute criminalizes a continuing scheme to defraud, but also imposes an enhanced penalty for certain specific acts that are not continuing or ongoing in nature, the government may charge the defendant with those acts even if they took place more than five years before the indictment was filed.

The parties have cited no case law specifically addressing this question, and I have found none. However, in *United States v. Torres*, 901 F.2d 205 (2d Cir. 1990), the Second Circuit confronted a statute—21 U.S.C. § 848—that charges a continuing offense and provides for enhanced penalties under certain specified circumstances. The enhanced penalty provisions were added to the statute after its original effective date. Although the statute charges a continuing offense, the enhanced penalty provision in 21 U.S.C. § 848, like the serious bodily injury en-

hancement in Section 1347, is triggered by discrete events taking place during the course of the scheme; insofar as relevant in *Torres*, these events include acting as the principal administrators or leaders of the charged enterprise. The jury instruction regarding the enhanced penalty in *Torres*, however, permitted the jurors to consider the defendants' leadership activities that took place prior to the effective date of the enhanced penalty provision. The Second Circuit held that the ensuing guilty verdict violated the Ex Post Facto Clause despite the continuing nature of the underlying offense, because "the instruction and verdict form permitted the application of section 848(b) to these defendants even if they did not engage in the specified conduct at any time after that section's enactment." *Torres*, 901 F.2d at 227.

By analogy, the continuing nature of the fraudulent scheme charged by the government in this case is an insufficient basis to support charges based on serious injuries sustained beyond the limitations period. The continuing aspect of a Section 1347 violation is the submission of a series of fraudulent claims; any resulting injury would be an isolated occurrence rather than a part of an ongoing pattern of activity. In other words, the serious bodily injuries charged by the prosecution were not executions or acts in furtherance of a scheme, but rather, discrete, episodic consequences of that scheme. This is demonstrated by the government's contention that defendant submitted approximately 1900 fraudulent claims on behalf of 143 patients over the fifteen-year period charged in the indictment,[6] but that only five patients sustained a serious injury during that time. Because the serious injuries were not a continuing aspect of the

---

**6.** *See* Government's Fraudulent Claims Bill of Particulars; Gov't Mem. Supp. Mot. In Li- mine at 4.

charged crime, the government should be precluded from attempting to prove at trial that patients N.S. and J.R. sustained serious bodily injuries more than five years before S–2 was filed.

I further recommend that the government be precluded from attempting to prove that patients F.L. and M.S. sustained serious bodily injuries. The government alleges with respect to these patients that, because Mermelstein falsely stated in his medical records that he was measuring and monitoring their eye pressures when in fact he was not, they suffered a worsening of their glaucoma and sustained a permanent loss of vision. Even assuming that F.L. and M.S. would not have suffered these consequences had their eye pressures been monitored regularly and properly, the government has failed to indicate how the false entries in Mermelstein's records "result[ed] in" the injuries F.L. and M.S. sustained, as Section 1347 requires. The government has not, for example, proffered any evidence indicating that F.L. and M.S. relied upon Mermelstein's representations to insurers that their eye pressures were being monitored, or even that F.L. and M.S. knew of those representations. Although · Section 1347 does not define the degree of connection between a scheme to defraud and a resulting injury sufficient to trigger an enhanced penalty, the plain meaning of the statutory language "results in serious bodily injury" requires more direct causation than the government's proffer establishes. Accordingly, I recommend that the government be precluded from attempting to prove that patients F.L. and M.S. sustained serious bodily injuries in violation of 18 U.S.C. § 1347.

The sole remaining patient is V.D. The government alleges that, in December of 2002, defendant inserted "punctal plugs" in patient V.D.'s eyes, but that the procedure was not medically necessary. S–2, ¶ 10. As a result of the procedure, V.D. suffered "excessive tearing of the eyes and protracted blurry vision." *Id.* The conduct charged with respect to V.D. took place within the limitations period, and an injury sustained as a result of a medically unnecessary procedure that was performed as part of a scheme to defraud would, as even defendant concedes, meet the statutory requirement that the scheme "result[ ] in" the injury. Transcript. of Feb. 14, 2007 ("Tr.") at 10–12. The only remaining question is whether "excessive tearing of the eyes and protracted blurry vision" constitutes a serious bodily injury for purposes of Section 1347.

Section 1347 incorporates the definition of "serious bodily injury" in Section 1365. Section 1365(h)(3) defines a serious bodily injury as one which involves "(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty." I am not prepared to conclude that the government should be permitted to inject the question of serious bodily injury into the trial of this case without more detailed information about the severity of the injuries sustained by V.D. In response to an inquiry I made during oral argument, the government has agreed to provide additional information about V.D.'s injuries. Tr. at 23–24. For the reasons stated above, I respectfully recommend that the prosecution be precluded from attempting to prove at trial that V.D. sustained a serious bodily injury unless, within a reasonable time, they proffer evidence which, if believed, could lead a reasonable juror to conclude that V.D. sustained a serious bodily injury as that term is defined in 18 U.S.C. § 1365(h)(3).

### D. Defendant's Statements and Production of Records to the OPMC

█ Prior to his arrest in this case, defendant Mermelstein was the subject of an investigation conducted by the Office of Professional Misconduct ("OPMC") of the New York State Department of Health. According to the government, Mermelstein provided altered and falsified records and made false statements to the OPMC during the course of its investigation. The indictment charges that Mermelstein's false statements and production of altered records to the OPMC were overt acts in furtherance of the conspiracy to violate Section 1035 set forth in Count One of S–2, as follows:

> In or about and between approximately June 2003 and July 2003, MERMELSTEIN altered the medical records of three Insured Patients, by falsifying entries in these records concerning intra-ocular pressures, visual acuities, visual complaints, and MERMELSTEIN's alleged discussions with the patients concerning the risks and benefits of, and alternatives to, medical procedures that he later performed and billed to Medicare and certain non-Medicare Plans, and he misrepresented these altered records as original, contemporaneously made records to the Office of Professional Misconduct of the New York State Department of Health.

S–2, ¶ 14(n). The government also contends that Mermelstein's statements and production of records to the OPMC violated Section 1035 itself, as charged in Count Three of S–2. *See* Tr. at 39–44.

False statements are proscribed by Section 1035 only if they are made in connection with "any matter involving a health care benefit program" or "the delivery of and payment for health care benefits, items and services." [7] Defendant contends that his statements to the OPMC were not made in the course of treating patients or seeking payment from health care benefit programs, and therefore cannot constitute violations of Section 1035.

█ To the extent it is directed to the conspiracy charged in Count One of S–2, I reject defendant Mermelstein's argument. An overt act need not be one that itself constitutes a substantive offense; any act in furtherance of the agreement to commit the substantive offense suffices. *See U.S. v. LaSpina,* 299 F.3d 165, 176 (2d Cir. 2002) ("[A]n overt act may be made by 'only a single one of the conspirators and need not be itself a crime.' ") *quoting Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942); *U.S. v. Montour,* 944 F.2d 1019, 1026 (2d Cir.1991) (holding that "an overt act need not be inherently criminal to support a conspiracy conviction," and that, "[i]f an act is relevant to the alleged conspiracy when viewed in light of all the evidence, it should not be stricken").

█ The government's theory, explained during oral argument, makes it clear that Mermelstein's statements to the OPMC are relevant to the conspiracy charged in Count One of S–2. The prosecution represents that it will prove at trial that Mermelstein not only produced fraudulently altered patient files to the OPMC, but also destroyed his original, accurate patient files and substituted the altered files for them in his office records. The government further contends that these

---

7. Section 1035 applies generally to "any matter involving a health care benefit program." This requirement applies to subsections (1) *and* (2), which are both charged in the indictment. In addition, subsection (2) is further qualified by the phrase "in connection with the delivery of or payment for health care benefits, items, or services."

office records were maintained in part for inspection by very same health care benefit programs Mermelstein is charged in this case with defrauding. *See* Tr. at 42. The government also contends that Mermelstein produced fraudulently altered records to the OPMC to conceal the true facts regarding his treatment of his patients from all outsiders, including the insurance providers who are the victims of the crimes charged in this case. *Id.* at 43 ("It was part of the scheme that he couldn't let inconsistent records outside the office.") Efforts to conceal an ongoing conspiracy may properly be charged as overt acts in furtherance of it. *U.S. v. Milstein*, 401 F.3d 53, 72 (2d Cir.2005) ("[E]fforts to secrete or launder moneys gained from a scheme for monetary gain, and to safeguard them from discovery or recovery, are to be considered acts in furtherance of the conspiracy, rather than mere acts of concealment of the commission of crime."). The government contends that Mermelstein's statements to the OPMC furthered the frauds he perpetrated on health insurance providers and safeguarded the financial gain he reaped as a result, and that they are therefore properly charged as overt acts in furtherance of the conspiracy alleged in Count One of S–2. Defendant's argument that the statements and records he provided to the OPMC are irrelevant to the charged conspiracy should therefore be rejected.

 Defendant's argument that his statements and production of documents to the OPMC do not constitute substantive violations of 18 U.S.C. § 1035 is more persuasive. As stated above, a fraudulent statement violates this section only if it is made in connection with "any matter involving a health care benefit program" or "the delivery of or payment for health care benefits, items, or services." The defendant's statements to the OPMC may have

described the health care services he provided to his patients, but they clearly were not statements made in the course of delivering health care services or trying to get paid for doing so. The government argues that the statements Mermelstein made to the OPMC violated Section 1035 because Mermelstein made them to retain his license to practice medicine and therefore "in connection with" his delivery of health care services. *See* Tr. at 44. A plain reading of the statutory language, however, leads me to conclude that the connection asserted by the prosecution is too attenuated to support its theory. I therefore recommend that the jury charge make clear that, although defendant's statements and submission of records to the OPMC may be overt acts in furtherance of the conspiracy charged in Count One, they are not, in and of themselves, violations of Section 1035 or sufficient to support a verdict of guilty as to Count Three.

### E. *Indictment Signature*

Both S–1 and S–2 were signed by a designee of the United States Attorney. Defendant seeks discovery about why the United States Attorney did not sign the indictments herself. I recommend that this aspect of defendant's motion be denied for the reasons stated during oral argument. *See* Tr. at 60–62.

### Government's Motion in Limine

The government seeks rulings on a number of evidentiary issues. Each is addressed below.

*Josephine Crone*

 Josephine Crone is identified in S–1 as Mermelstein's former office manager and co-conspirator. S–1, ¶¶ 2, 13. Crone has since entered a plea of guilty and is expected to testify for the government at trial. The government alleges that, although both were married at the time, Mermelstein and Crone had an affair

with each other throughout the course of the conspiracy. According to the government, Mermelstein secured Crone's continued participation in the conspiracy by threatening to tell Crone's husband about their affair. Gov't Mem. Supp. Mot. In Limine at 8.

Defendant argues that evidence of the affair is highly prejudicial and should be excluded pursuant to Federal Rule of Evidence 403. However, evidence of the nature of the relationship between alleged co-conspirators is frequently admitted by courts. *See, e.g., U.S. v. Fabian,* 312 F.3d 550, 557–58 (2d Cir.2002) (holding that prior bad acts committed together by co-conspirators may be admitted at trial as proof of the their relationship and corroboration of one's claim to know about the criminal acts of the other); *U.S. v. Rosa,* 11 F.3d 315, 334 (2d Cir.1993) (noting that the Circuit has "held repeatedly that it is within the court's discretion to admit evidence of prior acts ... to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between co-conspirators"). The evidence of the affair between Mermelstein and Crone is particularly relevant in this case because the government contends that Mermelstein used the fact of the affair in furtherance of the charged conspiracy.[8]

Moreover, it is difficult to fathom how Crone could testify about committing the charged crimes with Mermelstein and omit any mention of their affair. Crone's testimony, like that of any other "flipped" accomplice witness, is likely to be highly incriminating and aggressively challenged on cross-examination. The jury's evaluation of Crone's credibility may be a significant factor in their deliberations. If Crone were directed to omit any reference to such a central aspect of her relationship with Mermelstein, the jury might well be left with the impression that she was being evasive when, in fact, she was simply following the court's instructions.

Finally, although evidence of an extramarital affair may certainly be prejudicial, the potential prejudice is not overwhelming, particularly in the context of a doctor charged with perpetrating an extensive scheme to defraud that included performing unnecessary medical procedures upon his patients. Potential jurors who feel that evidence of infidelity might affect their impartiality may be identified during jury selection and challenged for cause.

For all these reasons, I recommend that Josephine Crone be permitted to describe her affair with defendant Mermelstein when she testifies at trial.

*Elizabeth McTigue*

■ Elizabeth McTigue was a patient of Mermelstein's practice during the course of the conspiracy. McTigue did not have health insurance, and the government does not contend that defendant's conduct with respect to her violated any of the statutes charged in the indictment. Gov't Mem. Supp. Mot. In Limine at 5. Rather, the government suggests that Mermelstein altered the entries in McTigue's chart to avoid a claim of medical malpractice or professional misconduct, and seeks to offer evidence of the alterations pursuant to Federal Rule of Evidence 404(b). Gov't Mem. Supp. Mot. In Limine at 5–7; Tr. at 87–90. The government contends that Mermelstein's alterations of the entries in McTigue's medical chart are relevant trial evidence because the alterations are so similar to those charged in the indictment

---

8. Not all facts relating to the alleged affair between Crone and Mermelstein are more probative than prejudicial. For example, that Mermelstein was married at the time of his affair with Crone does not seem relevant and might properly be excluded at trial.

as criminal acts. *Id.* Defendant argues that this evidence would be highly prejudicial and should be precluded pursuant to Rule 403.

Federal Rule of Evidence 404(b) provides that evidence of wrongful acts other than those charged in an indictment may not be admitted to prove that a defendant acted "in conformity therewith," but may be offered as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The Second Circuit has adopted an "inclusionary interpretation of the rule" that "allows evidence of other wrongs to be admitted so long as it is relevant and it is not offered to prove criminal propensity." *U.S. v. Pipola,* 83 F.3d 556, 565 (2d Cir. 1996). It is difficult to see, however, what purpose the McTigue evidence would serve other than as proof of Mermelstein's propensity for altering the medical records of his patients. Clearly, the motive for falsifying McTigue's records—to avoid malpractice or professional misconduct charges—is different from the motive to obtain payments from health insurers at issue in this case. Accordingly, the McTigue alterations are simply not probative of defendant's motive or intent to commit any of the crimes charged in the indictment. Similarly, there is no question about whether Mermelstein had the opportunity to alter the records the government claims he falsified; the records were his. Finally, the government intends to prove an enormous number of fraudulent claims and false statements at trial. Any additional probative value of the McTigue records in establishing preparation, plan, knowledge, identity, or absence of mistake or accident is minimal, and pales in comparison to the prejudicial value of otherwise irrelevant proof that Mermelstein altered patient records to avoid malpractice liability and charges of professional misconduct. For these reasons, I recommend that evidence of Mermelstein's alteration of Elizabeth McTigue's medical records be precluded at trial.

*Early Fraudulent Claims and False Statements*

Defendant seeks to preclude the government from offering evidence of fraudulent claims and false statements made by Mermelstein outside the limitations period. Defendant's argument, at least with respect to the fraudulent claims the government seeks to prove, presumes that the Court will grant his motion to dismiss on limitations and ex post facto grounds; if my recommendation that this aspect of defendant's motion to dismiss be denied is adopted, evidence of the early fraudulent claims would constitute evidence of the crimes charged and therefore be plainly admissible at trial.

■■■ The government acknowledges that some of the false statements it seeks to prove were made before the period charged in the indictment began. Gov't Mem. Supp. Mot. In Limine at 4. Even these statements (and the early fraudulent claims, even if defendant ultimately prevails on his limitations and ex post facto arguments), are admissible. As discussed above, other act evidence is admissible to prove the background of a conspiracy, the existence and scope of a criminal plan, and for any other relevant purpose other than a propensity to engage in similar criminal behavior. Moreover, evidence of criminal conduct not charged in the indictment is admissible without regard to Rule 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *U.S. v. Carboni,* 204 F.3d 39, 44 (2d Cir.2000).

 Here, evidence of the early fraudulent claims and statements meets this test. The proffered evidence demonstrates the origins of the scheme charged in the indictment as well as its scope. Moreover, assuming Crone will testify at trial about committing fraud at defendant's instruction as early as 1990, the false statements and fraudulent claims from that time period will corroborate her testimony. In addition, the government has made it clear that the early false statements, including those made before the period charged in the indictment began, are relevant to proving that some of the charged claims submitted by defendant to health care programs were fraudulent. Gov't Reply Mem. Supp. Mot. In Limine at 4. The early false statements are also relevant because they provide part of the foundation for the expert testimony the government intends to offer at trial, which will apparently include inferences, drawn by examining the data entered in defendant's medical records over time, that the charts must be fraudulent because the data they contain is so inconsistent with what would actually be observed while caring for any comparable group of patients. *Id.* Finally, there is little, if any, prejudice likely to result from admitting this evidence, because it is no more serious than the evidence the government will present of the charged crimes themselves. Accordingly, I recommend that defendant's attempt to preclude this proof from being admitted at trial be rejected.

## OPMC

Finally, defendant contends that evidence that he made false statements and produced altered records to the OPMC should be precluded pursuant to Federal Rule of Evidence 403 because it is more prejudicial than probative. Defendant argues that the very fact he was under investigation by the OPMC will prejudice the jury against him.

Defendant's argument should be rejected for several reasons. First, as discussed above, Mermelstein's statements to the OPMC are properly charged as overt acts in furtherance of the conspiracy charged in Count One of S–2. As criminal conduct charged in the indictment, the statements and records should be admitted. Second, the government has not suggested that it seeks to offer any evidence about the nature of the investigation undertaken by the OPMC or its results. *See* Gov't Mem. Opp'n Def. Mot. to Dismiss at 17. There is little reason to believe that lay jurors will even have heard of the OPMC, much less assume—particularly if the agency's full name is not used and there is no other reference to its mandate—that it investigates allegations of misconduct rather than merely oversees and regulates the practice of medical professionals generally. Finally, Count Four of the indictment charges defendant with falsifying and destroying records relating to an ongoing federal criminal investigation. The fact that Mermelstein's conduct was examined by the OPMC hardly seems more serious than that, and the prejudice that would result from admitting evidence about his statements to OPMC would therefore not be so overwhelming as to warrant its preclusion.

### Admission of Entries in Patient Charts for their Truth

Although the primary thrust of the government's proof at trial will be that defendant's patient charts are riddled with fraud, the government also intends to offer some chart entries for their truth. The government seeks a ruling that these entries should not be excluded on hearsay grounds.

 It is certainly clear that a statement made by an adverse party, whether directly or through an agent, co-conspira-

tor or anyone else authorized by the party to make a statement concerning the subject, is not hearsay when offered against that party. Fed.R.Evid. 801(d)(2). Defendant, however, challenges the authenticity of some of the records and entries the government seeks to introduce. As defendant correctly notes, whether these records should be received in evidence at trial will depend upon the foundation for their admission provided by the government when they are offered. A final ruling on admissibility should therefore await the trial itself.

## Defendant's Motion to Exclude Expert Testimony

Defendant moves to preclude certain expert testimony the government intends to offer at trial. "A motion *in limine* to preclude evidence calls on the court to make a preliminary determination on the admissibility of the evidence under Rule 104 of the Federal Rules of Evidence." *Allen v. City of New York*, 466 F.Supp.2d 545, 547 (S.D.N.Y.2006), *quoting Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, 2004 WL 1970144, at *4 (S.D.N.Y. Sept.3, 2004). "Evidence should not be excluded before trial unless it is clearly inadmissible on all potential grounds." *Id.*

The government has indicated that it may call as many as six expert witnesses to testify at trial. The government's proposed experts include three doctors, one statistician, and two document examiners. Defendant moves to preclude, on various grounds, the testimony of the three doctors, Friedman, Schein and Schachat, and the statistician, Lee.

Friedman is expected to testify about irregularities he observed upon reviewing defendant's medical records, including in particular defendant's patient charts. Gov't Mem. Opp'n Def. Mot. Exclude Expert Test. at 2–4. Schein's testimony will focus on diseases of the cornea and their treatment, and Schachat is expected to testify about diseases of the retina and their treatment. *Id.* at 2. The government plans to have Lee testify about how the measurements of intra-ocular pressures in defendant's charts compare with those one would expect to find in the general population. *Id.* at 18–19.

Defendant argues (1) that the testimony of Friedman, Schein and Schachat will be cumulative, (2) that Friedman's testimony about the content of the defendant's charts is improper summary witness testimony, (3) that Friedman's testimony as to alterations in the charts will reach ultimate issues, such as defendant's intent, (4) that Friedman is not qualified to assess the statistical probability of certain test results or analyze the handwriting in defendant's records, (5) that Friedman should not be permitted to opine that a failure to obtain a patient's informed consent to a procedure is evidence that the procedure was not medically necessary, and (6) that Lee's qualifications and observations are improper for a variety of reasons.

*Standard for Expert Testimony*

A qualified individual, applying "reliable principles and methods" to "sufficient facts or data," may provide expert testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Rule 702 "embodies a liberal standard of admissibility for expert opinions," but does not permit testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Nimely v. City of New York*, 414 F.3d 381, 395–97 (2d Cir.2005) (internal citations and quotations omitted).

*Unduly Cumulative Expert Testimony*

Federal Rule 403 allows a court to exclude cumulative testimony. To avoid duplicative testimony, some courts "permit each side to put on only one expert witness in any particular area of expertise." *AUSA Life Ins. Co. v. Dwyer*, 899 F.Supp. 1200, 1203 (S.D.N.Y.1995).

Defendant contends that the anticipated testimony of Schein and Schachat on diseases of the cornea and retina will duplicate the testimony the government intends to elicit from Friedman. This concern apparently arises from the statement in the government's letter of September 15, 2006, that "Dr. Friedman may testify to any of the matters previously disclosed in the summaries of the expected expert testimonies of Dr. Schachat and Dr. Schein." Decl. of Jonathan N. Halpern in Supp. Def. Mot. Exclude Expert Test., Ex. F. at 1. During oral argument, however, the government clarified that it has not finally decided whether Schein and Schachat will testify at trial and that, if they do, Friedman's testimony will be curtailed accordingly. Tr. at 72–74. Moreover, it appears from the briefs and arguments that the focus of Friedman's testimony will be on the records kept and procedures followed by Mermelstein's office, whereas Doctors Schein and Schachat, should they testify, will provide more general testimony about diseases and treatments. The government has at this point, then, merely put defense counsel on notice that it may offer general testimony about diseases of the eye and how they are treated from Friedman if it does not call Schein or Schachat. Should the government attempt to offer redundant expert testimony at trial, there is little doubt that defendant will have the opportunity to object and that Judge Johnson will prevent the government's witnesses from repeating themselves. This aspect of defendant's motion should be denied.

*Summary Witness Testimony*

Defendant next argues that Friedman should be precluded from summarizing the entries he observed in defendant's patient charts when he reviewed them in preparation for trial. Mermelstein argues that Friedman's expertise does not extend to collecting and summarizing data, and that his status as an expert will lend special credibility to his summary. Def. Mem. Supp. Mot. Exclude Expert Test. at 7–10.

Defendant's argument should be rejected. As the government reasonably responds, Friedman's expertise *was* required to review and understand defendant's medical records and extract the data relevant to his testimony from them; a lay witness would not have been able to perform this task. Gov't Mem. Opp.'n Def. Mot. Exclude Expert Test. at 9. Moreover, the federal rules explicitly contemplate that the contents of voluminous records may be presented in summary form. Fed. R.Evid. 1006.

Defendant, citing *U.S. v. Dukagjini*, 326 F.3d 45, 53 –56 (2d Cir.2003), argues that Friedman's status as an expert enhances the credibility of his summary testimony and that it should be precluded on that basis. The holding in *Dukagjini*, however, does not suggest that the summary testimony proffered by the government in this case is improper. *Dukagjini*, a narcotics prosecution, involved an expert witness who was also the government's case agent. The agent had monitored wiretap interceptions in the case for two months, and testified based upon his substantial experience investigating drug dealers generally as well as the knowledge he developed during his investigation of the defendants on trial. *Dukagjini*, 326 F.3d at 50. The Second Circuit found that it was proper for the agent to offer opinions based upon his

general knowledge and experience about code words used by the defendants during the intercepted conversations, but expressed concern about a case agent who "summarizes his beliefs about the defendant's conduct based upon his knowledge of the case." *Id.* at 53. The Court held that the particular expert testimony at issue should have been precluded because the case agent's "conclusions appear to have been drawn largely from his knowledge of the case file and upon his conversations with co-conspirators, rather than upon his extensive general experience with the drug industry." *Id.* at 55.

■ Friedman's proffered testimony in this case does not present the same concerns. Rather, the government's disclosures to date indicate that Friedman's anticipated testimony will be based upon his general knowledge of the practice of ophthalmology. Although he has reviewed medical records maintained by defendant's practice and is expected to describe his observations, the significance of the information he culled from those records and the opinions he will render about them will be based upon his training and experience as an eye doctor. There is simply no reason to believe that Friedman participated in the investigation leading to defendant's arrest or that his review of defendant's records and the summary of them he will offer to the jury will be based upon anything other than his general expertise and experience.

Finally, defendant challenges the relevance of the summary testimony Friedman is expected to offer. The government, however, has provided a detailed explanation of the significance of the findings Friedman made after reviewing defendant's medical records:

> Dr. Friedman will testify as to the very high frequencies with which he found identical or very similar entries

in the defendant's patients' medical charts concerning the types and exact degrees of visual complaints the patients were supposedly experiencing prior to cataract surgery ... Dr. Friedman ... will opine that it is virtually impossible, medically and statistically, that these entries are factually accurate ... Dr. Friedman will testify that: (1) the frequency with which visual acuity entries were "corrected" in defendant's cataract surgery charts is unprecedented in ophthalmological records; (2) "altering" entries by writing over them, as the defendant did in his cataract surgery charts, violates ordinary and accepted standards in the medical community for correcting medical records; and (3) there is no medical explanation as to why successive visual acuity readings supposedly taken on the same patients during the same visits should differ as often and as much as is reflected in the charts of the defendant's cataract surgery patients.

Gov't Mem. Opp'n Def. Mot. Exclude Expert Test. at 9–10.

The relevance of this testimony is clear. A reasonable finder of fact could infer from Friedman's observations that defendant deliberately falsified his medical records to indicate that procedures were necessary when in fact they were not. For this and all the other reasons stated above, this aspect of defendant's motion should be denied.

*Testimony as to Ultimate Issues*

Defendant objects to Friedman's proposed testimony that the defendant "altered" the visual acuity measurements in his charts "to make them appear worse." According to the defendant, the proposed testimony improperly suggests an opinion about his state of mind, an ultimate issue reserved for determination by the jury.

Friedman's testimony that the defendant "altered" his records "to make them look worse" might arguably be construed to impute an intention on the defendant's behalf, but the problem is merely one of semantics and may be easily resolved. The government has acknowledged that Friedman "will not be opining as to why the entries were altered" or otherwise offering his opinion about defendant's state of mind. Gov't Mem. Opp'n Def. Mot. Exclude Expert Test. at 15. The government is urged to make this clear in its direct examination, and defendant will certainly have the opportunity on cross-examination to confirm that Friedman's testimony is based only upon his review of defendant's records and not any direct knowledge of Mermelstein's state of mind. This aspect of defendant's motion should be denied as well.

*Other Objections to Friedman's Testimony*

Defendant raises several other objections to Friedman's testimony. First, defendant questions whether Friedman possesses the qualifications to render an opinion about the degree to which defendant's office and record-keeping practices deviate from those that would ordinarily be followed by an ophthalmologist. The admissibility of this testimony depends upon whether the government is able to establish a proper foundation for it at trial. The government describes Friedman as "a clinician, researcher and epidemiologist," Gov't Mem. Opp'n Def. Mot. Exclude Expert Test. at 3, and it is therefore reasonable to think that Friedman may in fact be qualified to offer the testimony the government intends to elicit. Defendant's challenge is more appropriately made at trial, when the court will have the benefit of the precise foundation established by the government.

Defendant next argues that, because Friedman is not an expert in handwriting analysis, he should not be permitted to testify that some of defendant's charts reflect a single handwriting and others appear to contain entries written by two or more individuals. The government has made clear, however, that it does not seek to have Friedman identify the author of any particular handwriting, but simply to relate his observations that some documents appear to be written in one hand and others in more than one. This is a conclusion easily reached even by someone who has no experience analyzing handwriting. Indeed, Federal Rule of Evidence 901(b)(2) specifically contemplates lay evaluation of handwriting under certain circumstances. This aspect of defendant's challenge to Friedman's testimony should be rejected as well.

Defendant similarly objects that Friedman should not be permitted to testify that the entries in Mermelstein's charts are virtually statistically impossible because Friedman is not a statistician. As a doctor and epidemiologist, Friedman undoubtedly has a relatively sophisticated understanding of statistics. Moreover, the type of generalized statistical analysis Friedman is expected to offer does not require sophisticated expertise. This aspect of defendant's motion should be denied as well.

Next, defendant objects to the government's suggestion that Friedman may testify that a certain procedures were not medically necessary because they were performed without first obtaining the patient's informed consent. Defendant argues that a failure to secure informed consent is different from a lack of medical necessity. While that may generally be true, Friedman is expected to testify that certain procedures are appropriately performed only if the patient, with a full understanding of the risks involved, decides that the interference with his or her daily life activities caused by his condition

justifies the risk of the procedure. Gov. Mem. Opp'n Def. Mot. Exclude Expert Test. at 16; Tr. at 91–92. Under these circumstances, the anticipated testimony concerning informed consent is proper.

Finally, defendant suggests that the government plans to have Friedman simultaneously assume and then opine that certain procedures Mermelstein performed were not medically necessary. This argument misconstrues the government's intentions. The government has explained that it will first have Friedman describe the criteria for determining if a procedure is medically necessary, then ask Friedman to assume certain facts the government will introduce through other means, and then finally render an opinion whether, in light of those facts, a particular procedure was medically necessary. Gov't Mem. Opp'n Def. Mot. Exclude Expert Test. at 16; Tr. at 97. There is nothing unusual or improper about this approach. This aspect of defendant's motion should be denied as well.

*Objections to Lee's Testimony*

Lee, a bio-statistician, is expected to testify that the readings indicated in Mermelstein's charts for particular patients are too improbable to be accurate. Lee reached his conclusion by comparing the entries in defendant's charts with data collected from patients in Olmstead County, Pennsylvania. The Olmstead County data was drawn from a peer-reviewed article published in a scientific journal and has been made available to defendant in discovery. Tr. at 85. Although defendant questions whether the data collected from patients in Pennsylvania may usefully be compared to entries in the charts of New York patients, he suggests no reason why the data at issue should be different for the two populations.

Defendant further argues that Lee's testimony is unreliable because some of the patient charts he reviewed were not selected at random. Tr. at 83. Lee's analysis, however, does not concern the uniformity of defendant's test results from patient to patient, but instead the improbability of such uniform results for a particular patient over time. Tr. at 84. The manner in which the individual patient's charts were selected therefore does not undermine the reliability of Lee's findings, at least not to a degree warranting their preclusion.

Defendant makes additional arguments about the admissibility of Lee's testimony that seem to be based primarily upon a lack of disclosure by the government. *See, e.g.,* Def. Mem. Supp. Mot. Exclude Expert Test. at 19 (stating that defendant is unaware of the "pool" of patients from which a certain sample was selected and seeking clarification regarding professional literature Lee relied on in making his findings). The government is urged to provide the additional discovery defendant seeks and to contact my chambers promptly if the parties are unable to resolve this aspect of their dispute without further court intervention.

For all these reasons, defendant's challenge to Lee's testimony should be denied.

**Conclusion**

For all the reasons stated above, I respectfully recommend as follows:

1) Defendant's motion to dismiss S–1 be granted with respect to the serious bodily injury charge in Count One and in all other respects be denied;

2) Defendant's motion to dismiss S–2 be granted to the extent that:

(a) the government be precluded from proving or arguing at trial that the injuries sustained by patients N.S., J.R., F.L. and M.S. constitute serious bodily injuries as charged in Count Two of S–2;

(b) the government be permitted to prove or argue at trial that the injury sustained by patient V.D. constitutes a serious bodily injury as charged in Count Two of S–2 only upon a proffer demonstrating that a finder could reasonably conclude that the injury satisfies the definition set forth in 18 U.S.C. § 1365(h)(3);

(c) that the government's proof with respect to Count Four be limited to conduct that took place on or after July 30, 3002;

(d) that the government be precluded from proving or arguing at trial that the defendant's statements and production of records to the OPMC constitute a violation of 18 U.S.C. § 1035 as charged in Count Three;

and in all other respects be denied;

3) Defendant's motion to compel discovery about why the indictment in this case was signed by a designee of the United States Attorney and not by the United States Attorney herself be denied;

4) Defendant's challenge to the admissibility of the statements he made and the records he produced to the OPMC be denied;

5) Defendant's challenge to the admissibility of evidence of his affair with Josephine Crone be denied;

6) Defendant's challenge to the admissibility of evidence of the "early" fraudulent clams and false statements be denied;

7) Defendant's challenge to the admissibility of evidence concerning his treatment of patient Elizabeth McTigue and records relating to that treatment be granted;

8) The government's application for a ruling that entries in defendant's medical records be admitted for their truth be deferred until trial; and

9) Defendant's motion to preclude the government's expert testimony be denied in its entirety.

Any objections to the recommendations in this report must be filed with the Clerk of the Court and the Chambers of the Honorable Sterling Johnson, Jr., within ten days of receiving this Report and Recommendation, and in any event, no later than April 6, 2007. Failure to file timely objections may waive the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(2); Fed.R.Crim.P. 59; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).